[Civ. No. 29957. Fourth Dist., Div. Two. Aug. 9, 1984.]

CARDINAL DISTRIBUTING COMPANY, INC., Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO,
Real Party in Interest.

**COUNSEL**

Hill, Farrer & Burrill, Edwin H. Franzen, Kyle D. Brown and James A. Bowles for Petitioner.

Manuel M. Medeiros and Daniel G. Stone for Respondent.

Dianna Lyons, Federico G. Chavez, Ellen J. Eggers, Daniel A. Garcia, Ira Gottlieb and Wendy Sones for Real Party in Interest.

**OPINION**

**MORRIS, P. J.**—Petitioner seeks statutory review of a final order of the Agricultural Labor Relations Board (hereafter Board) reported at 9 ALRB No. 36. (Lab. Code, § 1160.8.[1]) Petitioner contends the Board erroneously found that petitioner refused to bargain in good faith by (1) failing to pro-

---

[1]Unless otherwise stated, all statutory references are to the Labor Code.

vide information to the United Farm Workers (hereafter union); (2) initiating a unilateral wage increase, and (3) refusing to bargain a decision to cease growing beets which was, in effect, tantamount to subcontracting, and a mandatory subject of bargaining. Petitioner also contends that the make whole remedy imposed for the Labor Code violations was improper.

## DISCUSSION

Petitioner is composed of three business entities: Peter Rabbit Farms grows crops on owned and leased farmland in the Coachella Valley. Cardinal Distributing Company packs and stores the produce from Peter Rabbit Farms and other growers. Cardinal Produce Sales sells the crops on the wholesale market. All three entities are managed by John Powell and owned by his family.

On March 29, 1977, the union was certified as the exclusive bargaining representative for all of petitioner's agricultural employees. During the next two years there were some twenty-seven bargaining sessions. The union filed unfair labor practice charges in January and August of 1978. The general counsel filed a complaint in April of 1979 which charged petitioner with violating section 1153, subdivisions (a) and (e)[2].

## I

### Failure to Provide Information

One aspect of the duty to bargain "collectively in good faith with labor organizations" (§ 1153, subd. (e)) requires the employer to make a reasonable and diligent effort to comply with the union's request for relevant information. (*O. P. Murphy & Sons* (1978) 5 ALRB No. 63.) The importance of the rule, and its underlying policy consideration of fostering informed collective bargaining, are underscored by cases which hold that an employers' breach of the duty constitutes a refusal to bargain in good faith. (E.g., *NLRB* v. *Acme Industrial Co.* (1967) 385 U.S. 432, 435-436 [17 L.Ed.2d 495, 498-499, 87 S.Ct. 565]; *As-H-Ne Farms* (1978) 6 ALRB No. 9.)

---

[2]Section 1153 provides in pertinent part: "It shall be an unfair labor practice for an agricultural employer to do any of the following:

"(a) To interfere with, restrain, or coerce agricultural employees in the exercise of the rights guaranteed in section 1152.

". . . . . . . . . . . . . . . . . . . . . .

"(e) To refuse to bargain collectively in good faith with labor organizations certified pursuant to the provisions of chapter 5 (commencing with section 1156) of this part."

A. *Factual background.*

The union sent a request for information to petitioner on April 7, 1977, one week after it was certified as the bargaining representative for the employees. The three-page letter generally encompassed four categories of requested information: (1) Employees' vital statistics; (2) compensation and fringe benefits: (3) production and working requirements for the employees; and (4) health insurance and safety precautions.

Petitioner responded to the request on April 20, but the information it provided was insufficient in the following particulars:

(1) *Employees' Vital Statistics*: Petitioner provided information about its steady employees, but omitted the seasonal laborers and piece-rate workers. The information provided concerning the steady employees omitted the requested addresses and spousal data.

(2) *Compensation and Fringe Benefits*: Petitioner failed to provide a copy of the contract covering its packing shed employees and provided no information concerning vacation or holiday pay.

(3) *Production and Working Requirements*: No information was provided. Petitioner sent a letter to the union explaining that some of the requested information was in the possession of its labor contractor, Jose Ortiz.

(4) *Health Insurance and Safety Precautions*: Petitioner sent a copy of the wrong medical plan and omitted a copy of the plan covering its packing shed workers. Information on medical claims was not provided. Petitioner omitted any reference to four distinct pesticides used in its operations. Petitioner also provided no information concerning the schedule of pesticide application or the safety equipment available.

At a meeting in July, union negotiator, Ruth Shy, delivered a written summary to petitioner's representative, Al Caplan. The summary detailed the unanswered questions and repeated the request for the information. A copy of the summary was also delivered to petitioner's manager, John Powell.

One month later petitioner's representative responded by letter. The letter included a list of employees receiving vacation pay and a corrected list of pesticides and safety equipment. However, the letter again omitted the following requested information: (1) Data concerning the piece-rate workers; (2) addresses and spousal information of the steady employees; (3)

holiday pay information (the union was referred to an expired agreement); (4) a copy of the shed workers collective bargaining agreements; (5) health claims information (union was referred to an inapplicable plan); and (6) the amount or method of pesticide application.

With regard to the piece-rate workers, the company stated that the union would have to contact Ortiz when he returned to the area in late October. The letter explained that since the workers were on Ortiz' payroll, the company did not have the information.

At three bargaining sessions, Shy again asked Caplan for the missing information. Caplan either deferred to Ortiz or responded that there would be no further information forthcoming.

Subsequently, on January 16, 1978, union negotiator Eliseo Medina wrote to Caplan and requested the missing information. On January 19, petitioner was served with an unfair labor practice charge for failure to provide the information.

Petitioner provided some information about the piece rates at a meeting on January 20, but it was incomplete and outdated.

On January 23 Caplan wrote to Medina and promised that petitioner would make every effort to procure the wage and production data. On January 25, Caplan wrote that "[a]s soon as records are available and obtainable, copies will be given to you."

At two subsequent negotiating sessions, Medina explained the need and importance of the requested information. Caplan promised followup communication from petitioner but it never materialized.

On March 3, almost one year after the union's initial request, petitioner provided the first production information. The information was in the form of a summary, although Medina had earlier requested *copies of the records* and Caplan had confirmed the request through his January 25 letter. Petitioner's controller, Walter Watters, testified that it would have been a simple matter to photocopy the records.

Because the information in the summary was both deficient and, although *the union was unaware of the fact, based upon speculation, clarification was* sought. At a March 10 session, petitioner provided some clarification. Medina specifically requested copies of the records to verify the summary, but Caplan stated that nothing more would be provided.

On March 18 petitioner provided the union with a list of names and social security numbers for its piece-rate workers. This was the first time this particular information was provided. The list was not current, it did not reflect hours and crops or piece-rate classifications, and addresses were only provided for roughly one-fourth of the workers listed. The piece-rate workers constitute the bulk of petitioner's employees.

At a March 27 meeting, Medina voiced more complaints and requests for further information. Caplan replied that no further information was available.

On June 23, a union attorney wrote Caplan and summarized the outstanding requests for information. Watters provided some of the information on July 31.

The union requested more information at an August 18 meeting. At the meeting, petitioner informed the union for the first time of the existing contract it had with the packing shed employees.

On August 24, petitioner provided more data concerning its steady employees.

On September 1, petitioner provided the union with the aggregate total of medical claims of its employees for one year. However, the union had requested the data on an individual claim basis covering a two-year period. Although petitioner failed to provide this information in the form and for the period requested, the evidence established it was available because the insurance company had furnished it.

Finally, on September 20, petitioner sent the union a copy of the current collective bargaining agreement covering its packing shed workers.

B. *Findings.*

The administrative law judge's (hereafter ALJ) findings of fact were much more extensive than the manageable summary we have presented; his findings provided a more in depth look at petitioner's failure to timely respond in good faith to the union's requests for information. The ALJ concluded as follows: "Clearly, the company's information responses impeded in substantial fashion the bargaining it was required to engage in in conformity with section 1153(e) and 1155.2 of the act. [Fn. omitted.]"

The Board affirmed the ALJ's decision: "After reviewing the record, we find that respondent was consistently dilatory in providing the UFW with

the information it had requested and gave incomplete and inaccurate information to the union. The ALJ found that over a period of 15 months, UFW requests for data relevant to bargaining unit employees were responded to, if at all, with inexcusable delay and in an incomplete fashion, even considering the limitations of respondent's available staff. Nothing in respondent's exceptions convince us that those findings of the ALJ were in error.''

## C. *The standard of review.*

■ Section 1160.8 provides in pertinent part: "The findings of the board with respect to questions of fact if supported by substantial evidence on the record as a whole shall in like manner be conclusive." In this process of review, we do not reweigh the evidence or rejudge the credibility of witnesses. "If there is a *plausible basis* for the Board's factual decisions, we are not concerned that contrary findings may seem to us equally reasonable, or even more so. [Citations.]" (*Rivcom Corp.* v. *Agricultural Labor Relations Bd.* (1983) 34 Cal.3d 743, 756, 757 [195 Cal.Rptr. 651, 670 P.2d 305], cert. den., — U.S. — [80 L.Ed.2d 819, 104 S.Ct. 2345].) In keeping with section 1160.8, "[w]e will uphold the Board's decision if it is supported by substantial evidence on the whole record." (*Ibid.*) The rationale for this highly deferential standard of review is that the board's findings " 'carry the authority of an expertness which courts do not possess and therefore must respect.' " (*Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335, 346 [156 Cal.Rptr. 1, 595 P.2d 579].) The insights gained through the board's special expertise entitle its decisions to special deference. (*Penasquitos Village, Inc.* v. *N.L.R.B.* (9th Cir. 1977) 565 F.2d 1074, 1079.)[3]

## D. *Sufficiency of the evidence.*

■ In light of our previous summary of the facts, and the guiding legal principles, we conclude there is substantial evidence to support the Board's findings. The plausible basis in the record for petitioner's violations of its duty to bargain in good faith by failing to respond to the information requests in a timely manner are readily apparent to this court.

Petitioner failed to provide accurate current wage and production data. The first production data was provided 11 months after it was first requested. Some of the information was inaccurate. Information purporting to pertain to actual hours was incomplete and based on estimates.

---

[3]Section 1148 directs the board to "follow applicable precedents of the National Labor Relations Act, as amended."

Petitioner failed to provide the union with a copy of the medical insurance policy that covered bargaining unit employees. Instead, petitioner provided an inapplicable plan. Petitioner failed to provide any medical claims information for one year and five months. When the information was provided, it was incomplete in that it only covered the claims for one year. The information was also imprecise because it only contained the total amount of claims, whereas the union had requested the information on an individual basis. The information was also inaccurate because it did not include claims paid to Mexican doctors and did not inform the union that such claims were omitted.

Petitioner failed to accurately reply to the union's request for pesticide information including the schedule of its application for one year and three months after the original request. The company also failed to provide information concerning the wages and working conditions of other Cardinal employees, not included in the unit, and a copy of their collective bargaining agreement was not provided for one year and five months after it was first requested.

We turn now to petitioner's specific attacks on the sufficiency of the evidence.

1. *Relevancy.*

Cardinal contends that much of the information requested was irrelevant. However, the record reveals that this contention was never voiced during the negotiating sessions. The failure to raise the relevancy argument at that earlier stage constitutes a *waiver* of the contention on review. (*John S. Swift Co.* (1959) 124 NLRB 394, 44 LRRM 1388, 1389.) In any event, we are satisfied that petitioner's requests for information were in line with the broad and liberal relevancy standard applied on review. (See *N.L.R.B.* v. *Leland Stanford Jr. University* (9th Cir. 1983) 715 F.2d 473, 474.)

2. *Impeded bargaining.*

Petitioner contends there was no evidence that negotiations were impeded by its alleged failure to produce the information. This contention has no merit.

Petitioner's prolonged failure to provide piece-rate workers' names and addresses made it impossible for the union to talk with those employees and to meaningfully represent them. Petitioner's failure to relinquish Ortiz' payroll records obstructed the union's efforts to ascertain current wages and to

compose a proposal pertaining thereto. Petitioner's summary of the medical claims hampered the union's assessment of the company's benefit plans. Moreover, the union's repeated requests for this information reasonably implied that the data was necessary for bargaining and that petitioner's intransigence was successfully undermining the union's attempts to negotiate knowledgeably and to prepare realistic proposals.

We note "[t]he general counsel must show only that the information was necessary and relevant for collective bargaining, not that the delay in providing such information impeded negotiations." (*As-H-Ne Farms, supra,* 6 ALRB No. 9.)

Medina testified that due to the slow pace of negotiations, he was forced to send the union's first economic proposal without a piece rate because the union lacked the information necessary to formulate one. We conclude there is substantial evidence that petitioner's failure to provide the information impeded negotiations.

3. *Ortiz.*

Petitioner argues that the production information was inaccessible because it was in Ortiz' possession.

An employer's claim that the information is unavailable is insufficient to satisfy the duty to provide it, because the obligation requires a reasonably diligent effort to obtain the requested data. (*John S. Swift Co., supra,* 44 LRRM at p. 1389, fn. 1.) As a corollary, the union is not required to seek alternative means of acquiring such information. (*Borden Chemical* (1982) 261 NLRB 64, 109 LRRM 1358, 1360.)

The evidence reflects that the employees were still at their jobs when the union first requested the information. Petitioner contends the employees would not cooperate and provide the information; however, the board found against them with respect to this issue of fact and we are without power to substitute our own conclusion. (*Rivcom Corp., supra,* 34 Cal.3d at pp. 756-757.) Moreover, section 1140.4, subdivision (c) provides that an employer which engages a labor contractor shall be deemed the employer of the contractor's work force "for all purposes under [the act]." Section 1157.3 provides that "[e]mployers shall maintain accurate and current payroll lists containing the names and addresses of *all* their employees . . . [italics added]." Therefore, petitioner was under a legal duty to maintain the information.

Citing *Korn Industries, Inc.* v. *N. L. R. B.* (4th Cir. 1967) 389 F.2d 117, petitioner contends that inaccessible information need not be provided. However, petitioner has misinterpreted *Korn. Korn* held that information which did not *exist* need not be provided. (*Id.*, at p. 123.) That situation does not present itself here.

Citing *N. L. R. B.* v. *Milgo Ind., Inc.* (2d Cir. 1977) 567 F.2d 540, petitioner contends that the information was equally accessible to the union. However, *Milgo* is distinguishable. In *Milgo,* the court found that the employer's health plan was equally accessible to the union after the company representatives told the union the title of its Blue Cross plan and suggested they call the insurance company to obtain it. (*Id.*, at p. 543.) By contrast, there was no evidence that the union knew what company covered petitioner's employees, or that petitioner invited the union to contact a third party to obtain the information. To the contrary, petitioner purported to comply with the union's request rather than making the information available through other sources.

In the final analysis, petitioner's argument that Ortiz' possession of the information made it impossible to comply with the request is unavailing. Petitioner's controller, Watters, was the only individual who attempted to contact Ortiz at all in the spring of 1977. He testified that he attempted to telephone Ortiz' home in the Coachella Valley. There is no evidence that Watters attempted to call Ortiz' in the evenings, or contact him personally, or send a letter to his house. There is also no evidence that Watters attempted to ascertain Ortiz' location in Northern California. Since Ortiz was not expected to return until October, we conclude that petitioner's efforts to contact Ortiz lacked the required diligence. (*John S. Swift Co., supra,* 44 LRRM at p. 1389.)

4. *The summaries.*

Citing *Emeryville Research Center, Shell Dev. Co.* v. *N. L. R. B.* (9th Cir. 1971) 441 F.2d 880, 887, petitioner contends that the form of the information cannot constitute the basis for a refusal to bargain. However, the summary was deficient, and although requested, the union never received the copies of the original documents to check the veracity of the work product. Watters testified that providing the union with photocopies would have been an easy task.

## II

### *Unilateral Wage Increases*

A. *Facts.*

During February of 1979, petitioner and the union were engaged in contract negotiations. Petitioner raised the carrot bunchers' piece rate from $.26 to $.32. Petitioner instituted the increase without first notifying the union and affording it an opportunity to bargain.

The board found that petitioner's unilateral wage increase constituted a refusal to bargain.

B. *Contentions.*

On review, petitioner contends: (1) the wage increase was merely a continuation of the status quo rather than a unilateral change; (2) the union waived its right to object to the wage increase; and (3) the increase was justified by compelling business necessity.

1. *Status quo.*

■ Where an employer institutes a unilateral wage increase without prior notice to the certified union, he commits a per se violation of the duty to bargain in good faith. (*Labor Board* v. *Katz* (1962) 369 U.S. 736, 744-745 [8 L.Ed.2d 230, 237, 82 S.Ct. 1107].) The rationale for this holding is that a unilateral wage change subverts the union's role as the employees' representative. (See *Kaplan's Fruit & Produce Co.* (1979) 6 ALRB No. 36.)

In its concluding remarks, the *Katz* court stated: "[W]e do not foreclose the possibility that there might be circumstances which the Board could or should accept as excusing or justifying unilateral action. . . ." (*Labor Board* v. *Katz, supra,* 369 U.S. at p. 748 [8 L.Ed.2d at pp. 238-239].) Subsequently, the principle gradually developed that a unilateral increase granted to maintain the "dynamic status quo," in accordance with the established company practice, falls within an exception to the *Katz* rule. (E.g., *N. L. R. B.* v. *Ralph Printing and Lithographing Company* (8th Cir. 1970) 433 F.2d 1058, 1062, cert. den., 401 U.S. 925 [27 L.Ed.2d 829, 91 S.Ct. 883].) "Where there is a well-established company policy of granting certain increases at specific times, which is a part and parcel of the existing

wage structure, the company is not required to inform the union and bargain concerning these increases." (*Ibid.*)

However, the employer must prove that the increases are automatic. The timing and amounts of such raises must involve virtually no independent action or discretion by the employer. The employer thus "carries a heavy burden of proving that such adjustments of wages and benefits are purely automatic and pursuant to definite guidelines." (*N. L. R. B.* v. *Allis-Chalmers Corp.* (5th Cir. 1979) 601 F.2d 870, 875.)

Petitioner established no such past practice in evidence. The Board found petitioner failed to prove that it followed a set formula. The Board adopted the ALJ's findings that petitioner attempted to maintain wages at the prevailing rate in the geographic area at irregular and discretionary intervals. The board also found the increases were not mandated by fixed company policy. We have carefully reviewed the record and we conclude that the board's findings are supported by substantial evidence.

### 2. *Waiver.*

A waiver of the right to object to a unilateral wage increase must be clear and unequivocal; it may not be inferred from mere silence or acquiescence. (See *Murphy Diesel Company* v. *N. L. R. B.* (7th Cir. 1971) 454 F.2d 303, 307.)

In support of its waiver contention, petitioner relies on *Times Publishing Co.* (1952) 100 NLRB 638, 30 LRRM 1327. In *Times,* the union wrote a letter which protested the employer's failure to grant a particular increase. The letter was, in effect, a general waiver as to future increases because it assured the employer that there was no problem with granting an increase while negotiations were pending with the union. (*Times Publishing Co., supra,* 30 LRRM at pp. 1327-1328.)

*Times* is distinguishable. In this case there was no general waiver of unilateral increases during contract negotiations. The union agreed to two prior increases in November of 1977 and November of 1978. At that time, however, the collective bargaining had not progressed to a point where the exchange of economic proposals was imminent. That point was reached in February of 1979, when the disputed increase was granted. Therefore, since a waiver cannot be inferred merely from the union's past acquiescence (*Murphy Diesel Company* v. *N. L. R. B., supra,* 454 F.2d at p. 307), petitioner has failed to satisfy the required standard of clarity. The Board's finding of no waiver is supported by substantial evidence.

### 3. Business necessity.

Petitioner contends the wage increase was necessary in order to quickly attract more employees during the harvest season and thereby bolster its work force. Petitioner adds, "[t]he company simply did not have time to negotiate the wage increase with the union."[4]

The NLRB has recognized the existence of a compelling business justification to excuse or justify the unilateral implementation of a change in wages or working conditions. (See *Winn-Dixie Stores Inc.* (1979) 243 NLRB 972, 101 LRRM 1534.) However, economic considerations alone are not sufficient to justify a unilateral change. (*Airport Limousine Service, Inc.* (1977) 231 NLRB 932, 96 LRRM 1177, 1179-1180.) Moreover, neither exigent circumstances nor a business necessity completely absolves an employer of its duty to notify and bargain with the union. Bargaining is required to the extent that the situation permits, although an impasse is not necessary. Whether the business necessity defense exists is an issue determined on a case-by-case basis. (*Joe Maggio, Inc. et al.* (1982) 8 ALRB No. 72.)

Petitioner failed to notify the union or bargain before instituting the instant increase. Therefore, petitioner cannot avail itself of this defense. Because petitioner has failed to bring itself within the asserted exceptions to the *Katz* decision, none of its contentions, individually or collectively, have merit. The Board's findings concerning the unilateral wage increase are supported by substantial evidence.

### III

*Subcontracting of Beets*

#### A. Facts.

During 1977 and 1978, petitioner grew 24 acres of beets. The beet crop was harvested by petitioner's piece-rate workers under the direction of Ortiz. In July and August of 1978, petitioner decided to discontinue growing beets, green onions, and parsley. The union was not notified about the crop changes until after petitioner had made the decision.

---

[4]The union argues that petitioner waived its right to argue the business necessity contention. However, we have reviewed the record in light of the pertinent authorities and conclude that petitioner properly preserved the issue for review.

During the time that petitioner decided to discontinue the crops, it was making arrangements to lease 61 acres of newly developed farmland to a neighbor, Sam Keosean, operator of Keo-Farms. None of the land used to grow the discontinued crops was included in the lease.

Prior to negotiating the lease, Keosean learned from Powell that petitioner intended to discontinue the growing of beets, green onions and parsley. When the lease was executed in July of 1977, petitioner's decision to discontinue beets, green onions and parsley had already been made and announced to the union. At that time neither Powell nor Keosean knew what items would be grown on the leased land. Keosean told Powell he planned to grow leaf items (such as romaine, endive, escarole, red leaf and green leaf lettuce), and green onions. Powell testified that Keosean was an independent farmer who grew whatever he pleased.

On the 61 acres of leased land, Keosean decided to plant 40 acres of green onions, 15 acres of red beets and some assorted leaf crops. He also grew parsley on 8 acres of his own land. Keosean's beets were harvested by Keo employees, but they were packed by petitioner and sold under petitioner's labels.

The only evidence of any agreement with respect to the crops to be grown by Keosean was the testimony that there was an agreement that Keosean would deliver sufficient crops to Powell to cover the rental under the lease. Powell testified in pertinent part:

"[Q.] [W]hat crops did he [Keosean] agree that you were going to market-pack and market for him to guarantee the payment of this lease.

"A. None in particular. But most of them, yes, I knew that I would. In past years I had packed some of it but not all of it. And certainly he would—a man of his honor would not just take my land, grow his merchandise and not come my way with it so that I could recover my lease agreement.

"Q. So that you felt that you had a firm enough understanding that you were going to pack enough of his crops to recover this lease?

"A. You betcha."

Powell also stated that it was possible that one or two days of packing and sales could cover the lease. Powell's uncontroverted testimony established that there was no definite understanding as to what Keosean would grow to cover the lease. Based on past arrangements, Powell testified that

Keosean did not tend to follow advice; when Powell suggested that Keosean grow certain acreages, Keosean never followed Powell's advice. Keosean never planted crops when Powell suggested it. Keosean's independent nature prevented him from entering into an exclusive sales distribution arrangement with petitioner for the 1978-1979 season.

The Board found that the decision to cease growing beets and the decision to lease land, considered together, constituted subcontracting. The Board concluded that such subcontracting was a mandatory subject of bargaining. The Board's findings did not reveal why it found no similar violation in petitioner's decision to discontinue onions and parsley taken together with Keosean's decision to grow those crops on leased and owned farmland for petitioner to pack.

B. *Analysis.*

In *Fibreboard Corp.* v. *Labor Board* (1964) 379 U.S. 203, 209-215 [13 L.Ed.2d 233, 237-241, 85 S.Ct. 398, 6 A.L.R.3d 1130], the United States Supreme Court held that an employer's decision to subcontract bargaining unit work is a mandatory subject of negotiation with the certified union. An employer's failure to bargain before effecting such subcontracting was held to be an unfair labor practice.

Subsequently, in *First National Maintenance Corp.* v. *NLRB* (1981) 452 U.S. 666, 679 [69 L.Ed.2d 318, 331, 101 S.Ct. 2573], the court stated: "[I]n view of an employer's need for unencumbered decisionmaking, bargaining over management decisions that have a substantial impact on the continued availability of employment should be required only if the benefit, for labor-management relations and the collective-bargaining process, outweighs the burden placed on the conduct of the business."

Thus, if a decision falls within the category of those which lie at the core of entrepreneurial control, such as *what crops to grow or discontinue,* or involves a change in the scope and direction of the agricultural enterprise, it will not be subject to mandatory bargaining. However, if the decision focuses upon aspects of the employer/employee relationship that are amenable to collective bargaining (i.e., subcontracting), then such bargaining is mandatory because of the effect upon the conditions of employment. (See *Bob's Big Boy Family Restaurants* (1982) 264 NLRB 1369, 111 LRRM 1354, 1356. See also *Fibreboard Corp.* v. *Labor Board, supra,* 379 U.S. at pp. 221-224 [13 L.Ed.2d at pp. 244-246], Stewart, J. conc.)

Does a decision to cease growing one crop, coupled with a decision to sell and pack the same crop from a neighboring farmer, constitute subcon-

tracting, a mandatory subject of bargaining? The resolution of the issue requires consideration of the following four factors: (1) the nature of the employer's business before and after the disputed actions; (2) the reasons for the action; (3) the extent of capital expenditure involved in effectuating the change; and (4) the union's ability to meaningfully bargain, given the employer's goals and circumstances. (*Bob's Big Boy Family Restaurants, supra,* 111 LRRM at p. 1356.) The Board considered these factors when it found that petitioner had no duty to bargain with the union regarding its decision to cease growing parsley and green onions. The Board stated in pertinent part: "Generally, a decision by management regarding what crop to grow or discontinue is not subject to the bargaining process. [Fn. omitted.] Making decisions as to what crops to grow or discontinue is no more than an exercise of the agricultural employer's exclusive right to manage and control its business. Growing crops involves a substantial investment of capital and agricultural employers, as the owners of capital, must be free to determine now their capital should be used and managed. A decision concerning what crop to grow involves the use and management of capital and is not primarily concerned with the conditions of employment, even though the decision may have a substantial adverse effect on employment. [Fn. omitted.]"

However, the Board went on to find "there was a tacit agreement between Respondent [petitioner] and Keo-Farms that Respondent would market the produce grown on the 61 acres, which included 15 acres developed to grow beets. [Fn. omitted.]" The Board concluded "[t]hat the decision to discontinue beets required bargaining because Respondent in effect subcontracted its beet production to another grower. Respondent's business is to provide produce for wholesale and/or retail consumer markets. Growing beets was one component of that (whole) business and was not a separate or distinct enterprise. Although Respondent discontinued growing beets, it continued to pack and market beets grown by its neighbor Keo-Farms, Inc. (Keo-Farms) to whom it has leased 61 acres of land. . . . [¶] Both before and after the decision, Respondent marketed beets and there was no capital restructuring or investment which resulted from the decision."

There is no substantial evidence to sustain the Board's decision with respect to the beets. There is no evidence to support the finding of a subcontracting relationship. Without such evidence, the decision to discontinue growing the beet crop is exclusively a managerial decision and is not a mandatory subject of bargaining.

There is no evidence of any agreement that petitioner would market all the produce grown on all or any particular part of Keosean's 61 leased

acres. The UFW apparently concedes that petitioner was to produce and market only as much of Keosean's produce as necessary to generate a sales price sufficient to extinguish the lease debt. Even that tacit agreement never specifically required the growing of beets. According to the evidence, petitioner had *no control* over the type or amount of crops grown by Keosean. There was no exclusive marketing agreement with Keosean, and Keosean was free to have his beets packed by other packers or to pack them himself. There was no agreement that Keosean's beets would be packed by petitioner.

Moreover, the factual situation regarding green onions and parsley was similar to the beets, but the Board failed to explain why the beets warranted different treatment. Petitioner decided to discontinue green onions, and Keosean then grew the crop on 40 leased acres which petitioner packed. The same situation occurred with respect to parsley which was grown on eight acres of Keosean's own land. We conclude the Board has isolated petitioner's decision with respect to the beets and labeled it "in effect" subcontracting without a plausible basis in the record.

The Board cited *Bob's Big Boy Family Restaurants, supra,* as controlling, but we find it inapposite. In *Bob's,* a restaurant phased out its shrimp processing operation and contracted that operation to another company from which it purchased processed shrimp to serve its customers. The NLRB found this transaction to be subcontracting, which required bargaining with the union. The restaurant in *Bob's* continued to serve shrimp to its customers, and it specifically contracted with another company to supply that product. In the case at bench, there is no evidence that petitioner specifically needed beets to serve its customers, and petitioner made no arrangement which required Keosean either to grow beets or to supply them. The evidence shows that Keosean independently decided to grow beets and have petitioner pack them.

Thus, the threshold requirement of the *Bob's Big Boy* analysis has not been satisfied. In *Bob's* there was a written contract to supply shrimp which provided the basis for the subcontracting analysis. In this case there was no agreement to supply beets. Mere evidence of a close relationship is insufficient to support the finding of such agreement.

In any event, even if we consider the four factors outlined in *Bob's Big Boy* we find no evidence to support the Board's conclusion.

1. *The nature of petitioner's business before and after the disputed actions.*

Before petitioner discontinued its beet crop it exercised control over the cultivation and harvest, bore the expense of growing the crop, and suffered

the risk of loss for adverse crop or market conditions. After the crop was discontinued, there is no evidence that petitioner retained any control or bore any of the expense or risk of loss with respect to the crop grown by Keo-Farms.

### 2. *The reasons for the action.*

The only evidence regarding the reasons for the discontinuance of the beet crop is that set forth in the findings of the ALJ, to wit: "The company discontinued red beets because it was not an economical crop, as beets were grown only in small parcels, required more preparation than other crops, and had not been worthwhile the previous year." This is clearly a decision primarily involving the use and management of capital.

### 3. *The extent of capital expenditure.*

Although the beet crop, as one component of petitioner's business, may not have involved extensive capital restructuring, it was to the extent of that crop a complete elimination of its investment. Because there was no specific agreement that Keosean would grow beets, it cannot even be said that the deferred lease payment was dependent on the beet crop.

### 4. *The union's ability to bargain.*

Given the employer's reasons for discontinuing the beet crop, it is difficult to see how the union could meaningfully bargain. The fact that it was not economically profitable for petitioner to grow beets has little to do with the conditions of employment.

We conclude that petitioner's decision to cease growing beets was not subject to bargaining, and the Board's decision to the contrary is reversed.

### IV

### *Make-whole Remedy*

Petitioner contends the make-whole remedy was improper.[5] The ALJ imposed make-whole relief for the failure to provide information. The ALJ

---

[5]In this connection, petitioner has relied on *Carian* v. *Agricultural Labor Relations Bd.* (Cal.App.), and *San Clemente Ranch* v. *Agricultural Labor Relations Bd.* †(Cal.App.). Both cases were deleted from the Official Reports. Therefore, we granted a motion to strike petitioner's references and citations to these authorities.

†Deleted on direction of Supreme Court by order dated October 19, 1983.

did not impose make whole relief for petitioner's unilateral wage increase or its refusal to bargain over the crop discontinuance. The ALJ ordered petitioner to "cease and desist" from engaging in such unfair labor practices with respect to these latter two violations.

The Board adopted the ALJ's order but went somewhat further. The Board imposed the make-whole order on the basis of not only petitioner's failure to provide information but also on its failure to bargain over the unilateral wage increase.[6] Also, a separate, limited make-whole remedy was imposed for petitioner's decision to cease growing beets. This remedy must be reversed based upon our previous discussion.

With regard to the remaining remedies, section 1160.3 provides in pertinent part: "If, upon the preponderance of the testimony taken, the board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, the board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, to take affirmative action, including . . . making employees whole, when the board deems such relief appropriate, for the loss of pay resulting from the employer's refusal to bargain, . . ."

■ A reviewing court should not disturb the board's remedial order "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the act." (*Butte View Farms* v. *Agricultural Labor Relations Bd.* (1979) 95 Cal.App.3d 961, 967 [157 Cal.Rptr. 476].)

The rationale for this rule is that " 'the relation of remedy to policy is peculiarly a matter of administrative competence . . . .'" (*Jasmine Vineyards, Inc.* v. *Agricultural Labor Relations Bd.* (1980) 113 Cal.App.3d 968, 982-983 [170 Cal.Rptr. 510].) " '[C]ourts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy.' " (*Ibid.*)

Cognizant of these fundamental principles, we turn to Cardinal's specific attacks on the remedy. Citing *J. R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1 [160 Cal.Rptr. 710, 603, P.2d 1306], peti-

---

[6]Petitioner contends the board only imposed make-whole relief for the failure to provide information. However, although the board adopted the ALJ's findings, we are satisfied that the make-whole relief was based on the two violations we have cited.

tioner contends the Board issued the remedy on a per se basis without careful evaluation. The *Norton* court stated: "Not only are there degrees of violations [citation] but, more fundamentally, other factors peculiar to labor relations may outweigh the appropriateness of make-whole relief in particular cases." (*J. R. Norton Co.* v. *Agricultural Labor Relations Bd., supra,* 26 Cal.3d at pp. 39-40.) However, as the California Supreme Court has recently reiterated, the *Norton* holding applies where an employer "commits a 'technical' refusal to bargain as the only means to obtain judicial review of a *colorable, good faith challenge to union certification.*" (*Rivcom Corp.* v. *Agricultural Labor Relations Bd., supra,* 34 Cal.3d at p. 772, italics added.) The court explained that when an employer's refusal to bargain is not a good faith attempt to obtain judicial review, but instead involves an illegal tactic, the *Norton* holding is irrelevant: "No purpose of the ALRA would be served by insulating them from responsibility for the losses caused by their unlawful failure to bargain." (*Id.,* at pp. 772-773. We conclude the Board fully complied with the teachings of *Norton.*

Petitioner contends that the information sought was not relevant and there was no evidence that bargaining was impeded. However, petitioner's contentions are answered by our earlier discussion. (*Ante,* at pp. 767-768.)

Finally, petitioner contends that the remedy must be vacated because it is punitive. Although the Board has great discretion in fashioning a remedy to effectuate the policies of the act, such discretion is not unbounded. "It must be exercised reasonably by the Board whose 'power to command affirmative action is remedial, *not punitive, . . .'*" (*Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 93 Cal.App.3d 922, 940 [156 Cal.Rptr. 152], original italics.) If the Board's remedy is exceedingly harsh in proportion to the conduct comprising the unfair labor practice, then the remedy will be deemed punitive in character, and it will be annulled.

We have reviewed the Board's decision in light of the facts and guiding principles and are satisfied that the make-whole relief imposed for the failure to provide information and the unilateral increase in wages bears an appropriate relation to the policies of the ALRA.

The Board's finding that petitioner's decision to discontinue growing beets was a mandatory subject of bargaining because it in effect subcontracted its beet production to another grower is reversed. (9 ALRB No. 36, at pp. 17-18.) The cease and desist order (9 ALRB No. 36, p. 22(c)) and limited make-whole relief (9 ALRB No. 36, at p. 23(e)) imposed upon petitioner's

decision to cease growing beets are reversed. In all other respects, the decision of the Board is affirmed.

McDaniel, J., and Rickles, J., concurred.