[No. E002924. Fourth Dist., Div. Two. Sept. 30, 1986.]

GEORGE ARAKELIAN FARMS, INC., Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO,
Real Party in Interest.

**COUNSEL**

Rynn & Janowsky and Lewis P. Janowsky for Petitioner.

Daniel G. Stone, Manuel M. Medeiros and Michael G. Lee for Respondent.

Dianna Lyons and Wendy Sones for Real Party in Interest.

**OPINION**

**KAUFMAN, J.**—Petitioner was found by the Agricultural Labor Relations Board (ALRB or Board) to have committed unfair labor practices in unilaterally changing wages and discontinuing a fuel allowance. Petitioner sought review and we issued an order to show cause.

I

*Procedural History*

George Arakelian Farms, Inc. (Arakelian) is a corporation engaged in growing lettuce in the Blythe area of the Palo Verde Valley and is subject to the Agricultural Labor Relations Act (the Act). In December 1976, a representation election was conducted among Arakelian's agricultural employees. The United Farm Workers of America, AFL-CIO (UFW or Union) received the majority of votes cast.[1] On February 2, 1978, the Agricultural Labor Relations Board (ALRB or Board) certified the results of the representation election and designated the UFW as the collective bargaining representative. (See *George Arakelian Farms, Inc.* (1978) 4 ALRB No. 6.)

On February 6, 1978, the UFW requested that Arakelian begin negotiations. Arakelian refused to bargain, assertedly to obtain judicial review of the validity of the election. As a result Arakelian was charged with and found guilty of violating Labor Code section 1153, subdivisions (a) and (e)[2] and it was ordered to make its employees whole for economic losses resulting from Arakelian's refusal to bargain. (See *George Arakelian Farms, Inc.* (1978) 4 ALRB No. 53.) The validity of the election and the propriety

[1]The breakdown of votes was approximately: 139 for the Union, 12 for no union, and 17 unresolved challenged ballots.

[2]All statutory references are to the Labor Code. The Agricultural Labor Relations Act (or ALRA) is found at section 1140 et seq.

Under section 1153, subdivisions (a) and (e) it is an unfair labor practice: "(a) To interfere with, restrain, or coerce agricultural employees in the exercise of the rights guaranteed in Section 1152."

"(e) To refuse to bargain collectively in good faith with labor organizations certified pursuant to the provisions of Chapter 5 (commencing with Section 1156) of this part."

of order for make-whole relief were ultimately upheld by the California Supreme Court. (*George Arakelian Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1985) 40 Cal.3d 654 [221 Cal.Rptr. 488, 710 P.2d 288].)[3]

While the charges relating to Arakelian's original refusal to bargain were still pending, the UFW on November 30, 1979, filed new charges, asserting additional violations of section 1153, subdivisions (a) and (e). The new charges were based on allegations Arakelian had unilaterally increased wages and discontinued a fuel allowance without either notifying the Union or giving it an opportunity to bargain over the changes. After hearing, an administrative law officer (ALO) issued a proposed decision that Arakelian's conduct constituted unfair labor practices and a recommended order that included yet another make whole provision. A three-member panel of the ALRB in a two to one decision adopted the findings and conclusions of the ALO, treating several additional issues raised by the exceptions filed by Arakelian, and issued an order substantially embodying the recommendations of the ALO. (George Arakelian Farms, Inc. (1982) 8 ALRB No. 36.) The propriety of the Board's decision and order are at issue in this review.

II

*Facts*[4]

A. *The Operation of the Farm*

Petitioner has been in the business of growing lettuce for approximately 25 years. There are two lettuce harvest seasons per year, one in the spring and one in the fall. The spring harvest usually begins in late February and runs for about four or five weeks, until early April. The fall harvest usually begins in November and runs through December.

Petitioner's business was managed by George Arakelian until his death in April 1979. Following that, his son Daniel Arakelian took over supervision of the lettuce harvests.

---

[3]This case has come before us several times. The first time the particular order involved here came before us, the validity of the Union certification was in question and we remanded the case to the Board for consideration in light of the certification case, which we had remanded for an investigatory hearing on Arakelian's objections to certification. If the certification had been invalidated, there would have been no further need to consider the instant wage and benefit charges. However, the certification was ultimately upheld by the California Supreme Court (see *George Arakelian Farms, Inc.* v. *Agricultural Labor Relations Bd., supra,* 40 Cal.3d 654), and this case was then retransferred for decision to this court by the California Supreme Court which had granted hearing in the interim.

[4]Because we have made minor additions, deletions and changes we shall not use quotation marks, but we nevertheless acknowledge that our statement of facts is borrowed in substantial part from the decision of the ALO.

The harvesting is usually done by groups of three workers, the basic wage rate being a "lettuce trio rate." The trio is comprised of a cutter/packer, a loader, and a closer. The rate also applies to additional workers who sometimes assist in the operation. Approximately 50 employees work in the harvest each day, although the number of workers needed varies depending on the weather and the stage of the season; fewer workers are needed at the beginning of the season. The individual workers vary on a day-to-day basis, with a turnover as some stop working at the petitioner's business and go to work somewhere else.

Petitioner obtains its employees through a labor contractor. Until February 1979, petitioner used Leandro Gomez as its labor contractor; beginning approximately March 1979 it has used Willie Morales as its contractor. Petitioner pays the labor contractor a price for each carton of lettuce harvested; the contractor then pays a trio rate per carton to the employees.

On February 2, 1978, the UFW was certified by the Board as the exclusive bargaining representative for petitioner's agricultural employees. It was stipulated that on February 6, 1978, the Union requested petitioner to commence bargaining and that since February 28, 1978, petitioner has refused to meet and bargain collectively with the Union. It is further stipulated that since February 2, 1978, petitioner has never given notice to, nor negotiated with, the UFW over any changes in wages, hours or working conditions.

B. *The Wage Rates*

It was undisputed that in November 1979 petitioner agreed with its labor contractor Leandro Gomez to and did raise the lettuce trio rate to 74 cents from the 63 cents it had been when last set in spring of 1979. Much of the evidence that was presented and the stipulation of the parties concerning changes in the lettuce trio rate in earlier years went to petitioner's asserted defense that the fall 1979 change was not a change at all but the continuation of a longstanding practice for the adjustment of the rate.

The testimony concerning wage rates showed the following. For approximately 15 years, through February 1979, Leandro Gomez supplied lettuce harvest workers to petitioners. Before each harvest season Mr. Gomez would meet with George Arakelian and they would make an oral agreement as to a contract price per carton of lettuce harvested. The price would be paid to Mr. Gomez, who then paid his workers their trio rate out of the overall rate paid to Mr. Gomez by petitioner. The trio rate to be paid to the employees was factored into the total price agreed to between petitioner and Mr. Gomez. There were no written agreements. Mr. Gomez paid his employees on a

cash basis at the end of each day. On one occasion, in the spring 1978 season, Mr. Gomez and Mr. Arakelian reached an agreement on a wage increase approximately one week after the harvest season began.

Mr. Gomez testified that at these preseason discussions he would bring Mr. Arakelian check stubs from two other lettuce growers in the area, showing what their current wage rates were. Mr. Arakelian would then check with the other companies. Following this, Mr. Arakelian and Mr. Gomez would agree on the contract price. Mr. Gomez testified that Mr. Arakelian always agreed to Mr. Gomez's requested contract price.

Louise Smoot, petitioner's office manager, testified that at George Arakelian's request she would call other lettuce growers each season to confirm what their current lettuce wage rates were. She testified that she was sometimes asked to call specific companies, and sometimes she would use her own judgment as to which companies to call. In the spring 1978 season she called three growers, and in the fall 1978 season she called one grower.

There are approximately 12 lettuce growers in the immediate area around Blythe, California, where petitioner's premises are located.

In February 1979, Mr. Gomez's association with petitioner was ended, and Willie Morales became the labor contractor used by petitioner. For about a week at the end of the fall 1978 harvest season (in February 1979) Mr. Morales and Mr. Gomez worked together; following that Mr. Morales became the sole contractor used by petitioner.

Beginning with the spring 1979 harvest season, Mr. Morales negotiated the contract price with Daniel Arakelian. Mr. Arakelian continued his father's method of meeting with the contractor prior to the season to negotiate an oral agreement for a contract price. He also directed Ms. Smoot to call some other growers in the area, as she had previously, to confirm their wage rates. After this Mr. Arakelian would make an oral agreement with Mr. Morales. Mr. Arakelian testified that he tried to agree to a price sufficient to keep him competitive in the area. There were no written agreements.

It was stipulated that new lettuce trio rates have been instituted a number of times since the Union was certified in February 1978. Specifically, the trio rate was increased from 56 cents per carton in the spring 1978 season to 60 cents for fall 1978, decreased to 57 cents and then increased to 63 cents for spring 1979, and increased to 74 cents for fall 1979 when the charge in this case was filed.

## C. *The Fuel Allowance*

The employees supplied to petitioner by labor contractor Leandro Gomez lived in several different border cities and towns in the area around petitioner's premises. Petitioner would notify Mr. Gomez how many workers were needed, and Mr. Gomez would tell the workers. They would drive in cars to the border crossing, where Mr. Gomez would meet them and tell them the location of the fields to be harvested.

Mr. Gomez paid the driver of each car a sum of money, from five to ten dollars a day depending on the size of the car, for transportation fuel expenses. Mr. Gomez paid his workers their harvest rate on a cash basis at the end of each day; the transportation fuel allowance was also paid in cash at the end of the day, and was in addition to the harvest trio rate. In late February 1979, Mr. Morales took over as labor contractor. The testimony was not clear as to how many of the employees who had previously worked at petitioner's business were used by Mr. Morales. Mr. Morales testified that he did not discharge any previous employees, and that he used the workers who showed up at his office in El Centro on a first-come basis. Mr. Morales testified that he did not know if any of these workers had been supplied to petitioner previously by Mr. Gomez. The workers used by Mr. Morales, as was the case with those supplied by Mr. Gomez, drove to petitioner's premises from various border towns and cities.

Mr. Morales paid his workers by check. When he took over as labor contractor he discontinued giving any transportation allowances. No such allowances have been given since that time.

Pilar Lizarraga testified that he worked as a waterer at petitioner's farm for Mr. Gomez, and then continued on when Mr. Morales took over. He testified that he drove to work and received a fuel allowance under Mr. Gomez, and that he no longer received an allowance after Mr. Morales took over in March 1979.

Mr. Gomez had discussions with George Arakelian in which Mr. Gomez asked Mr. Arakelian to rent a labor camp for the lettuce workers. Mr. Gomez testified that in one season Mr. Arakelian did rent a labor camp. However, the lettuce workers did not want to stay at the camp, preferring to commute from their homes. They continued to drive to work, the drivers receiving the transportation allowance.

In 1979 Mr. Morales asked Daniel Arakelian to rent a labor camp for the lettuce workers. Mr. Arakelian did rent a camp, paying $5,100 for rent in

1979. However, Mr. Morales testified that the workers did not want to stay at the camp. They continued to drive to work, and Mr. Morales continued his practice of not paying any transportation fuel allowance.

## III

### *Discussion of Contentions and Issues*

A. *The Wage Increases*

The charge of an unfair labor practice based on a unilateral change in wages without notice to or negotiation with the Union was filed by the UFW on November 30, 1979. The charging allegation read: "On or about Nov. 25 the company instituted a unilateral change in wage rates." The complaint based on the unilateral change in wages was filed December 8. Its charging allegation read: "On or about November 25, 1979, respondent, Arakelian Farms . . . instituted a unilateral change in wage rates without notice to or negotiations with the UFW, the certified bargaining agent." On February 23, 1981, a first amended complaint was filed, the charging allegation of which alleged in this respect: "On or about November 25, 1979, respondent, Arakelian Farms, by and through its agent, Willie Morales, instituted a unilateral change in wage rates by increasing the lettuce trio rate without notice to or negotiations with the UFW, the certified bargaining agent."

Notwithstanding the absence of any charge by the UFW or any allegation in the complaint of an unfair labor practice based on the changes in lettuce trio rates in the spring and fall of 1978 and the spring of 1979, the Board in its decision purported to determine that each of those changes constituted a separate unfair labor practice and in its make whole order purported to require petitioner to "Make whole its employees for all economic losses they have suffered as a result of [petitioner's] refusal to bargain with the UFW, and the unilateral changes [petitioner] made in their wages . . . since December 1978."

Petitioner contends there is no substantial evidence the increases were "unilateral changes" of wages; rather it urges as it attempted to show below, that the wage adjustments were simply part of a longstanding, in-place method of determining wages. In addition, Arakelian argues a finding of liability for the charge cannot be based upon the increases in 1978 and April 1979 because: (1) the complaint did not charge those changes as violations of the Act; (2) the evidence of those changes was introduced by Arakelian itself purely defensively, attempting to establish its theory of consistency with its historical practice; and (3) prosecution of unfair labor practice

charges on account of these incidents was barred because they occurred more than six months before the unfair labor practice charges were filed in November 1979.

■ We agree with petitioner that the Board's findings of separate unfair labor practices based on the 1978 and spring 1979 changes cannot stand because they were not charged nor otherwise properly placed in issue and because petitioner was not placed on notice it was required to defend against those charges. Consequently, we are not required to resolve petitioner's contention that charges based on those changes would have been barred by the statute of limitations nor the countercontentions of the Board and UFW that any such statute of limitations defenses were waived by petitioner's failure to timely raise them. ■ As to the fall 1979 change in the lettuce trio rate, we conclude the law and evidence support the Board's finding of an unfair labor practice.

■ The simple facts are that the 1978 and the spring 1979 changes were never charged. All of the evidence that they occurred as well as the detailed stipulation concerning them was presented as part of petitioner's effort to prove that the fall 1979 change was "in line with the company's long-standing practice" and thus was "a mere continuation of the status quo." (See *Labor Board* v. *Katz* (1962) 369 U.S. 736, 746 [8 L.Ed.2d 230, 238, 82 S.Ct. 1107, 1113]; *N.L.R.B.* v. *Southern Coach & Body Company* (5th Cir. 1964) 336 F.2d 214, 217-218.) At no time prior to decision was petitioner given notice it might be found guilty of separate unfair labor practices on the basis of the changes in trio rates in 1978 and the spring of 1979, not even by a motion to amend to conform to proof.

The proposed decision of the ALO was ambiguous on the point. Although its recommended make whole order went back to 1978, the ALO's proposed decision noted that the complaint charged an unfair labor practice occurring on or about November 25, 1979, and ultimately concluded "that [petitioner] unilaterally instituted discretionary wage rates without giving notice to or bargaining with the employees' certified bargaining representative, and that *this* constituted *a* violation of Sections 1153(a) and (e) of the Act." (Italics added.) Petitioner's exceptions reveal clearly that it read the ALO's decision as finding only one unfair labor practice based on the wage change and the response to the petitioner's exceptions is susceptible to a reading that that was also the understanding of general counsel.

■ It is true that "[a] violation not alleged in the complaint may nevertheless be found when the unlawful activity was related to and *intertwined with allegations* in the complaint *and the matter fully litigated. (Doral Hotel*

*and Country Club* (1979) 240 NLRB 1112.)" (*Harry Carian Sales* v. *Agricultural Labor Relations Bd.* (1985) 39 Cal.3d 209, 251-252 [216 Cal.Rptr. 688, 703 P.2d 27], italics added.) However, in this case the 1978 and spring 1979 changes in the lettuce trio rates were not intertwined with the charged offense based on the fall 1979 change. Petitioner attempted to explain its fall 1979 change as part of an established practice, but the changes were separate and distinct. Nor were the 1978 and spring 1979 changes fully litigated as unfair labor practices. The evidence was not presented as proof of unfair labor practices at all; as already explained it was presented as part of petitioner's defense to the charged offense alleged to have occurred on or about November 25, 1979.

█ As stated by the court in *Miller* v. *Peters* (1951) 37 Cal.2d 89, 93 [230 P.2d 803]: "It is settled law that where the parties and the court proceed throughout the trial upon a theory that a certain issue is presented for adjudication, both parties are thereafter estopped from claiming that no such issue was in controversy even though it was not actually raised by the pleadings. (14 Cal.Jur. § 62, p. 974; *Northwestern M. F. Assn.* v. *Pacific W & S Co.* [(1921)] 187 Cal. 38, 40 [200 P. 934]; *Baar* v. *Smith* [(1927)] 201 Cal. 87, 98-99 [255 P. 827]; *McAllister* v. *Union Indemnity Co.* [(1935)] 2 Cal.2d 457, 460 [42 P.2d 305].) But such principle of estoppel operates only where it appears 'from the record on appeal . . . that the issue was actually and intentionally tried by the introduction of pertinent evidence, and that the party against whom the estoppel is invoked consciously participated or acquiesced in such trial as if the issue had been made by the pleadings . . .' (*Ortega* v. *Cordero* [(1891)] 88 Cal. 221, 227 [26 P. 80]; see 2 Cal.Jur. § 69, p. 239, and cases there cited.) *Furthermore, there is the added 'qualification that evidence which is relevant to an issue actually raised by the pleadings cannot be considered as authorizing the determination of an issue not presented.* [Italics added.]' (*Freeman* v. *Gray-Cowan, Inc.* [(1933)] 219 Cal. 85, 87 [25 P.2d 415].)" (Accord *Lein* v. *Parkin* (1957) 49 Cal.2d 397, 400-401 [318 P.2d 1]; see also *Inouye* v. *Pacific Gas & Elec. Co.* (1959) 53 Cal.2d 361, 367 [1 Cal.Rptr. 848, 348 P.2d 208].)

█ Considerations of due process of law therefore require that the findings concerning the uncharged unfair labor practices be set aside. (*Harry Carian Sales* v. *Agricultural Labor Relations Bd., supra,* 39 Cal.3d 209, 220, 252; *Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 93 Cal.App.3d 922, 933-934 [156 Cal.Rptr. 152]; cf. *Perry Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1978) 86 Cal.App.3d 448, 469 [150 Cal.Rptr. 495].)

We turn to the charged offense based on the fall 1979 change in rates, which, we observe in passing was well within the six-month limitations period.

██ In adopting the ALO's finding that the fall 1979 change constituted an unfair labor practice, the Board majority stated: "The wage increases granted in this case were not part of an automatic increase, but were discretionary changes, the amount and timing of which were determined by [Petitioner's] general manager Dan Arakelian and, before him, by general manager George Arakelian. Although the increases were usually granted at the beginning of a harvest, labor contractor Gomez testified that in one year the increase was delayed for about a week, and the stipulation entered into by the parties at the hearing indicates that increases were granted at different times during different years and sometimes twice in one season. Dan Arakelian testified that, when the labor contractor requested a wage increase for the workers, he did not automatically grant the request, but first made inquiries about the wages other growers were paying. On such occasions, Arakelian did not always contact the same number of area growers in order to determine the prevailing wage rates. Arakelian testified that, after making his survey of area wage rates, he established his rate at a point between the highest and lowest wage rates in the area; i.e., an amount which he believed was necessary in order to continue to attract qualified workers. Even though [Petitioner's] unilateral wage increases were based to some extent on objective factors, such as the wages other area employers were paying, Arakelian's own testimony reveals that he exercised considerable discretion in determining the amount and timing of the increases. In such circumstances, the matter of wage increases is a proper and mandatory subject of collective bargaining. *N. A. Pricola Produce* [Dec. 31, 1981] 7 ALRB No. 49."

Existing law and substantial evidence support the Board's conclusion. "An employer's unilateral changes in terms and conditions of employment when it is under a duty to bargain in good faith are 'per se' refusals to bargain and, thus, violate section 1153, subdivisions (a) and (e)." (*Ruline Nursery Co.* v. *Agricultural Labor Relations Bd.* (1985) 169 Cal.App.3d 247, 264 [216 Cal.Rptr. 162].) ██ UFW and Board are quite correct that petitioner's duty to notify the Union and negotiate with it concerning changes in wages and working conditions existed notwithstanding the fact the propriety of its certification was under review in this court and later in the California Supreme Court. (*N.L.R.B.* v. *Winn-Dixie Stores, Inc.* (5th Cir. 1966) 361 F.2d 512, 516, cert. den. *sub. nom. Winn-Dixie Stores, Inc.* v. *N.L.R.B.* (1966) 385 U.S. 935 [17 L.Ed.2d 215, 87 S.Ct. 295] disapproved on another point in *First National Maintenance Corp.* v. *N.L.R.B.* (1981) 452 U.S. 666, 679 [69 L.Ed.2d 318, 331, 101 S.Ct. 2573, 2581];

*Lucas County Farm Bureau Cooperative Assn.* (1960) 128 NLRB 458, 471-472 [46 LRRM 1327], enforced (6th Cir. 1961) 289 F.2d 844, cert. den. 368 U.S. 823 [7 L.Ed.2d 28, 82 S.Ct. 42]; see also *Highland Ranch* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 848 [176 Cal.Rptr. 753, 633 P.2d 949] (employer's bad faith refusal to bargain with the union while awaiting formal certification of election results constituted an unfair labor practice).)

█ Board and UFW are also correct that the "status quo" defense is held not to be applicable to unilateral changes involving the exercise of substantial discretion on the part of the employer. (*Cardinal Distributing Co.* v. *Agricultural Labor Relations Bd.* (1984) 159 Cal.App.3d 758, 771 [205 Cal.Rptr. 860]; *N.L.R.B.* v. *Allis-Chalmers Corp.* (5th Cir. 1979) 601 F.2d 870, 875; *N.L.R.B.* v. *Ralph Printing & Lithographing Co.* (8th Cir. 1970) 433 F.2d 1058, 1062-1063; see *Labor Board* v. *Katz, supra,* 369 U.S. 736, 746, 747 [8 L.Ed.2d 230, 236, 82 S.Ct. 1107, 1113].) Here the evidence indicated petitioner had considerable discretion in the exact timing of a change in the lettuce trio rate and in the exact amount of the change in the rate. While petitioner made an effort to ascertain the going rate in the area and attempted to fix a rate somewhere between the highest and lowest in the area so as to be competitive, the figures selected as constituting the parameters and the exact amount of the change were essentially discretionary with petitioner. At most, the evidence permitted conflicting reasonable inferences to be drawn and on review that is the end of the matter.

B. *The Fuel Allowance*

With respect to the unfair labor practice found by the Board on account of petitioner's discontinuance of the fuel allowance, petitioner contends first that its action was justified because it had rented a labor camp for its workers in lieu of paying a fuel allowance and second that the Board erred in rejecting its statute of limitations defense because as no fuel allowance was paid after March 1979 and the unfair labor practice charge was not filed until November 30, 1979, considerably more than six months later.[5]

As to the statute of limitations, the Board concluded the defense had been waived by petitioner's failure to raise it in its exceptions to the ALO's proposed decision and that in any event the limitations period had not expired because (1) the offense was a continuing violation of the Act and (2)

---

[5]Section 1160.2 provides in relevant part: "No complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the board and the service of a copy thereof upon the person against whom such charge is made . . . ."

petitioner failed to prove the UFW knew or should have known of the discontinuance of the fuel allowance, so the limitations period did not commence running until shortly before the charge was filed.

■ We think it appropriate to indicate we do not agree with the Board that the discontinuance of the fuel allowance was a continuing violation of the Act. (See *Bonwit Teller, Inc*. (1951) 96 NLRB 608 [28 LRRM 1547], enforcement denied on another issue (2d Cir. 1952) 197 F.2d 640, cert. den. (1953) 345 U.S. 905 [97 L.Ed. 1342, 73 S.Ct. 644].) However, it is unnecessary for us to resolve the questions of whether or not petitioner waived the statute of limitations defense or whether the defense is jurisdictional so that it cannot be waived by a simple failure to raise it in exceptions, because substantial evidence supports the Board's finding and conclusion that petitioner failed to prove UFW knew or should have known of the discontinuance of the fuel allowance more than six months before it filed the charge.

The period of limitations contained in ALRA section 1160.2 does not begin to run until the charging party has either actual or constructive notice of the act claimed to constitute an unfair labor practice. (*Ruline Nursery Co.* v. *Agricultural Labor Relations Bd., supra,* 169 Cal.App.3d 247, 264-265; *Montebello Rose Co.* v. *Agricultural Labor Relations Bd.* (1981) 119 Cal.App.3d 1, 30-31 [173 Cal.Rptr. 856].) The ALO found the Union as the charging party did not have actual or constructive notice of the termination of the fuel allowance more than six months before filing the charge. When Morales took over as the labor contractor in February or March 1979, the transportation fuel allowance was ended. Morales could not state whether any of the workers he provided to Arakelian were holdovers from the workers supplied by the previous labor contractor, Mr. Gomez. There was no testimony that any worker informed the Union of the termination of the fuel allowance. Although one employee testified he received the allowance before March 1979 and continued working for Arakelian after the allowance was terminated, there was no testimony that he or anyone else ever notified the Union. The ALO found that Arakelian's showing that one employee had actual knowledge of the change was not sufficient to meet the burden of showing that the Union had actual or constructive notice.

Again, the very best that can be said for petitioner's position is that the evidence is susceptible to conflicting inferences, but so saying is of no assistance to petitioner on review.

The Board did not separately address petitioner's claimed business necessity defense based on its providing a labor camp in lieu of the fuel

allowance; however, it adopted the ALO's findings and conclusions rejecting the claimed defense.

■ The ALO disallowed the business justification defense, stating: "The testimony of Mr. Gomez shows that prior to 1979 [Petitioner] had rented a labor camp, but when the employees preferred not to stay there they continued to receive the transportation fuel allowance when they commuted. Respondent again rented a labor camp in 1979, and the employees again preferred to commute. This time, however, the transportation allowance was not paid. There was no evidence introduced to indicate any special necessity or hardship present in the latter year that was not present in the former." Accordingly, the ALO found that there was no special justification for Respondent's unilateral termination of the transportation fuel allowance.

The ALO's findings and conclusions in this regard are supported by substantial evidence. As noted by the ALO, the additional expense of operating a labor camp had been incurred by Arakelian also in an earlier year without discontinuance of the fuel allowance. Arakelian presented no evidence of a change in circumstances that would have prevented it from providing both benefits in the 1979 season as it had earlier.[6]

We conclude therefore that the finding of an unfair labor practice based on the unilateral discontinuance of the fuel allowance award should be affirmed.

IV

*The Make Whole Order*

Petitioner advances a number of arguments in support of a contention the make whole order is inappropriate, will not serve to effectuate the purposes of the Act and is overbroad. ■ The order is certainly overbroad to the extent it requires the make whole remedy with respect to the trio rate changes prior to fall 1979, and insofar as it purports to order make whole for petitioner's "refusal to bargain with the UFW" apart from the unilateral changes properly found to constitute unfair labor practices. The order will therefore be vacated for reconsideration by the Board in light of our reversal of the unfair labor practices found on the basis of the rate changes prior to fall 1979, and in light of the fact that the make whole order in 4 ALRB

---

[6]In his dissenting opinion member McCarthy would have allowed the statute of limitations defense as to the discontinuance of the fuel allowances, but specifically rejected the proffered justification for the discontinuance of the fuel allowance.

No. 6 has now been judicially approved (*George Arakelian Farms, Inc.* v. *Agricultural Labor Relations Bd., supra,* 40 Cal.3d 654, 668). We agree with petitioner that the very lengthy delay in this case was caused by circumstances over which it had no control and the efficacy of yet another make whole order at this late date appears questionable. However, that is not a decision this court can make; that decision is for the Board. And we do not find a make whole order in this case irreconcilable with the Board's decisions in *Kaplan's Fruit and Produce Company* (1980) 6 ALRB No. 36 or *N. A. Pricola Produce* (1981) 7 ALRB No. 49.

The claims that the make whole order might be interpreted as applicable to inappropriate times and to workers who would not have continued working on petitioner's farm (cf. *George Arakelian Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1980) 111 Cal.App.3d 258, 278-279 [168 Cal.Rptr. 537]) are not ripe for decision and should await clarification by the Board should it again render a make whole order on remand or, as UFW suggests, should await review of orders made in the compliance stage.

## V

### *Disposition*

The Board's decision is annulled insofar as it determines the wage changes before fall 1979 constituted unfair labor practices; otherwise the decision is affirmed. The cause is remanded to the Board for reconsideration of its remedial order in light of this decision and opinion and especially part IV thereof. In the event the Board determines to reissue a make whole order, it is directed to delete therefrom any requirement for remedial action with respect to trio rate changes made prior to fall 1979.

Rickles, Acting P. J., and McDaniel, J., concurred.