[Nos. H000334, H000351, H000352. Sixth Dist. July 21, 1988.]

PAUL W. BERTUCCIO, Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO, Real Party
in Interest.

[No. H000302. Sixth Dist. July 21, 1988.]

BERTUCCIO FARMS, Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO, Real Party
in Interest.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976.1 and 976(b), this opinion is certified for partial publication. The portions to be published follow.

## COUNSEL

Lewis P. Janowsky, Patricia J. Rynn, Laurie Laws-Coats, Dressler, Quesenbery, Laws & Barsamian, Mary R. L. Schwartz, Rynn, Schwartz & Janowsky and Rynn & Janowsky for Petitioner.

Ronald A. Zumbrun, Robin L. Rivett and James I. Collins as Amici Curiae for Petitioner.

Manuel M. Madeiros, Daniel G. Stone, Robert W. Farnsworth, Nancy C. Smith, Cathy Christian, Michael E. Hersher, Michael G. Lee, Charles Landau, Fred A. Slimp II, Bernard McMonigle and Michael D. Stump for Respondent.

Diana Lyons, Daniel A. Garcia, Wendy Sones, Federico G. Chavez, Ellen J. Eggers, Ira Gottlieb, Dean M. Beer, Chris A. Schneider, Marcos Camacho and Silvia Viarnes for Real Parties in Interest.

OPINION

**BRAUER, J.**—Paul W. Bertuccio, an individual produce grower doing business as Bertuccio Farms, has petitioned for review of four decisions and orders of the Agricultural Labor Relations Board (Board). The petitions (in our proceedings H000334, H000351, H000352, and H000302) raise multiple issues. Because all of them arise out of an essentially continuous series of events, involving a single grower, we have considered them together. We conclude that one of the Board's decisions (our proceeding H000352) should be affirmed, one (our proceeding H000302) must be annulled, and two (our proceedings H000334 and H000351) must be remanded to the Board for further consideration of specified issues.

Bertuccio has been in business in San Benito County for many years. United Farm Workers of America (UFW), AFL-CIO, was designated the collective bargaining representative for workers at Bertuccio Farms at a representation election in October 1977. In November 1978 the Board dismissed Bertuccio's objections, upheld the election, and certified the UFW. In December 1978 the UFW formally demanded that Bertuccio bargain collectively.

For three and a half years, from January 1979 until July 1982, the parties bargained intermittently without reaching agreement. These proceedings arise out of events during and shortly after that period.

For convenience we shall refer to all administrative and judicial proceedings in each of the four matters by our proceeding numbers.

### I. *H000334 and H000351*

Two of the proceedings before us deal primarily with issues directly related to the negotiations between Bertuccio and the UFW. Our proceeding H000334, for review of *Paul W. Bertuccio* (1982) 8 ALRB No. 101 as modified in *Paul W. Bertuccio* (1983) 9 ALRB No. 61, covers the period from January 1979 through September 1980. After an interruption of several months, bargaining resumed in April 1981. Our proceeding H000351, for review of *Paul W. Bertuccio* (1984) 10 ALRB No. 16, covers the period from April 1981 through July 1982.

H000334 and H000351 have several issues in common. For efficiency of exposition we shall discuss the matters together.

One conclusion we shall reach, as to both matters, is that a remand is necessary for further proceedings on the makewhole remedy (Lab. Code,

§ 1160.3) in light of *William Dal Porto & Sons, Inc.* v. *Agricultural Labor Relations Bd.* (1987) 191 Cal.App.3d 1195 [237 Cal.Rptr. 206] (*Dal Porto II*). In both H000334 and H000351 the Board has moved for a "limited remand" of the makewhole issues to the Board, before this court's judgment, for further consideration under *Dal Porto II*. In the circumstances a prejudgment remand would be inefficient. Instead we shall resolve all issues tendered and return a comprehensive decision to the Board in each matter.

## A. SUMMARY OF ISSUES

Issues unique to H000334 arise out of the Board's conclusion that under the Agricultural Labor Relations Act (ALRA) (Lab. Code, § 1140 et seq.) Bertuccio had been obliged, but had failed, to bargain with the UFW concerning the *effects* of his June 1979 decision to sell a certain garlic crop for seed (rather than to permit his workers to harvest it for market), but had not been obliged to bargain concerning the *decision* itself. We shall conclude that Bertuccio was required to bargain neither the decision nor its effects, and shall annul so much of the decision and order as finds Bertuccio to have been guilty of an unfair labor practice for having failed to bargain the effects.

At issue primarily or exclusively in H000351 are the Board's conclusions:

(1) That Bertuccio's insistence on exclusion from the bargaining unit of certain workers provided by labor contractor Quintero amounted to a refusal to bargain in good faith. We shall affirm this conclusion.

(2) That Bertuccio had improperly bargained directly with members of the bargaining unit concerning wages. We shall conclude that the record is insufficient to show more than a minimal and hypertechnical impropriety not amounting to an unfair labor practice.

(3) That the UFW had not been bound by Bertuccio's acceptance, on the eve of the administrative law judge (ALJ) hearing, of a package proposal the UFW had tendered three months before at the session at which negotiations had broken down. We shall reverse this conclusion, finding as a matter of law that the acceptance was effective and that the UFW should have entered into a collective bargaining agreement.

At issue in both H000334 and H000351 are Board conclusions:

(1) That in seven instances Bertuccio had not furnished timely or otherwise adequate responses to certain of the UFW's requests for information.

We shall conclude that in five of the seven instances the record does not support the Board's conclusion.

(2) That Bertuccio had been obliged, but had failed, to bargain with the UFW concerning "unilateral" increases in wages to his employees while negotiations were continuing. We shall affirm this conclusion in each matter.

(3) That in cumulative effect Bertuccio had improperly engaged in "surface bargaining" (i.e., had gone through the motions without any real intent to reach a collective bargaining agreement). We shall affirm this conclusion in each matter.

(4) That the UFW had not refused to bargain in good faith. We shall affirm this conclusion in each matter.

(5) That in addition to other remedies Bertuccio should be required to make his employees whole for economic losses, with interest keyed to the prime rate adjusted annually. In each matter we shall reject Bertuccio's challenge to the Board's use of a variable interest rate, but shall remand the matter of makewhole to the Board for further proceedings, upon specified terms, in light of (1) our determination of other issues as set forth below, (2) the recent decision in *Dal Porto II,* and (3) (in H000351) evidence of strike violence, relevant to the Board's determination whether makewhole should be ordered but improperly excluded by the ALJ's rulings.

## B. The Issue Raised in H000334*

. . . . . . . . . . . . . . . . . . . . . . .

## C. Issues Raised Primarily in H000351

1. *Quintero.* *

. . . . . . . . . . . . . . . . . . . . . . .

2. *Direct Bargaining.* *

. . . . . . . . . . . . . . . . . . . . . . .

---

* See footnote, *ante,* at pages 1369.

### 3. *Bertuccio's Unqualified Acceptance.*

The Board concluded in H000351 that in the circumstances of record Bertuccio's July 25, 1982, acceptance of the UFW's April 8, 1982, package proposal was ineffective. Read in light of recent federal decisions, the record before us establishes as a matter of law that Bertuccio's acceptance was fully effective and that a collective bargaining agreement should have been entered into at that time. We conclude that in light of the acceptance Bertuccio should in no event be subject to a makewhole order, in H000351, for any period after July 24, 1982.

For some time before the April 8, 1982, meeting Bertuccio and the UFW had been bargaining with reference to some 51 separately identifiable topics. It sufficiently appears that as the April 8 meeting began some 18 topics remained in dispute. At the beginning of the meeting Bertuccio (by Gega) presented a written proposal as to 17 of the remaining topics.

In the course of the meeting the UFW presented a written proposal of its own. In essence the UFW agreed with Bertuccio as to eleven topics, leaving seven in dispute: Union security, seniority, a medical plan, duration of the agreement, wage rates, and the two closely interrelated topics which by this time were probably the focus of dispute between the parties: Hiring and the bargaining unit.

The UFW proposal at the April 8 meeting was presented through a mediator, after a union caucus part way through the meeting. The most significant UFW concession was in a handwritten addendum, prepared during the caucus, by which the UFW proposed that harvest operations on five enumerated crops be excluded from the bargaining unit. The UFW had never previously budged on the bargaining-unit issue: It had regarded the bargaining unit as "the lifeblood of the union at the ranch." But the UFW's proposal was what it called "a settlement package": "[W]e made a decision to give them five. Give them five harvest operations to get this thing wrapped up. [¶] We wanted a contract that day." If Bertuccio had agreed to the UFW's proposal submitted at the April 8 meeting, the UFW would have been willing to sign a contract on that basis.

On hiring, on April 8 Bertuccio had resubmitted a proposal the crux of which was that Bertuccio would be permitted to use labor contractors as he had previously. The UFW's proposal was for a centralized hiring procedure similar to that outlined by Bertuccio, but without exception for labor contractors.

The UFW's proposal also stated its position as to each of the other topics still in dispute.

Gega's initial reaction to the UFW proposal was that the UFW's "overall movement was in the right direction and we were getting there pretty quick." But there was "a big problem with duration"—Bertuccio wanted a three-year contract and the UFW only one year—and there were other details to be worked out. The major problem was still with hiring and the definition of the bargaining unit. The discussion grew heated. According to Gega, UFW president Cesar Chavez announced "he was walking out; that the Union would not make any more proposals. Again, he threatened that the Company would be forced to make concessions; that they could step up the strikes and the boycotts; that he felt that the Union had met the Company more than halfway, and he was going to force the Company to sign a worse contract than the Union was offering."

There were no further collective-bargaining negotiations between the parties before the hearing on this complaint began on July 26, 1982.

On July 9, 1982, Bertuccio withdrew his petition for unit clarification and proposed to the UFW, "in an effort to break the current deadlock in negotiations, . . . to include the employees of Jesus L. Quintero into the bargaining unit . . . ."

Then on July 25, 1982, the day before the ALJ hearing was to begin, Gega sent a late-evening telex to UFW negotiator Paul Chavez: "Paul W. Bertuccio accepts, in its entirety, the UFW's last proposal submitted April 8 1982. Please contact me as soon as possible to arrange for the execution of the collective bargaining agreement."

The UFW rejected Bertuccio's acceptance, asserting that the April 8 proposal had been taken off the table "when you rejected it on that date" and that there had been new developments which would require alteration of the proposal. The UFW enumerated five asserted changes of circumstance, characterized as "a few of our . . . concerns." The UFW treated Bertuccio's telegram "as a proposal which we hereby reject."

Thereafter there was a desultory exchange of proposals but no agreement was reached.

Before the ALJ, Bertuccio appears to have argued that the UFW's rejection of the July 25 telex was evidence that the UFW's April 8 "settlement package" had not been tendered in good faith; Bertuccio evidently considered this just one of several examples of improper UFW bargaining conduct, asserted by Bertuccio as an affirmative defense.

In this court Bertuccio shifts his position slightly, arguing on the basis of *Presto Casting Co.* v. *N.L.R.B.* (9th Cir. 1983) 708 F.2d 495 that

when he "accepted the UFW's proposals in their entirety, the union was legally bound to execute a collective bargaining agreement."

The UFW responds that it had no obligation to accept the July 25 telex because (1) it had taken the April 8 proposal off the table at the end of that session; (2) the purported "acceptance" of July 25 was unreasonably delayed; and (3) "it would be manifestly unfair to require the UFW to sign . . . ." The UFW undertakes to distinguish *Presto Casting* on the second ground. The Board adds a contention that Bertuccio had rejected the UFW's "settlement package" "at the time it was made" on April 8.

Relatively recent federal cases have perceived distinctions in terms of purpose and policy between collective bargaining agreements and traditional contracts. ■ The leading case is *Pepsi-Cola Bottling Co., etc.* v. *N.L.R.B.* (1981) 659 F.2d 87: "[T]he common law rule that a rejection or counterproposal necessarily terminates the offer has little relevance in the collective bargaining setting. In addition, this contract principle runs counter to federal labor policy which encourages the formation of collective bargaining agreements. We therefore agree with the Board's policy, as stated in its brief, that 'a contract offer is not automatically terminated by the other party's rejection or counterproposal, but may be accepted within a reasonable time unless it was expressly withdrawn prior to acceptance, was expressly made contingent upon some condition subsequent, or was subject to intervening circumstances which made it unfair to hold the offeror to his bargain.' Under this policy, an offer, once made, will remain on the table unless explicitly withdrawn by the offeror or unless circumstances arise which would lead the parties to reasonably believe that the offer had been withdrawn." (*Id.* at pp. 89-90 (fns. omitted); cf. *Capitol-Husting Co., Inc.* v. *N.L.R.B.* (7th Cir. 1982) 671 F.2d 237, 244; *Teamsters Local Union No. 688* v. *N.L.R.B.* (8th Cir. 1985) 756 F.2d 659, 662.)

In *Presto Casting Co.* v. *N.L.R.B., supra,* 708 F.2d 495, the Ninth Circuit restated the *Pepsi-Cola* rule in terms of *Pepsi-Cola's* quotation from the National Labor Relations Board's (hereafter NLRB) brief: "*Pepsi-Cola* held that an offer is not automatically terminated by rejection or counterproposal. Rather, it may be accepted within a reasonable time unless (i) it was expressly withdrawn; (ii) it was made expressly contingent on a condition subsequent; or (iii) circumstances intervening between offer and purported acceptance would characterize the latter as simply unfair. [Citation.] We now adopt that holding as the law of this Circuit." (708 F.2d at p. 498, fn. omitted.)

We find no California case which addresses these issues; accordingly we shall rely on the federal precedents. (Lab. Code, § 1148; see *Rivcom Corp.* v.

*Agricultural Labor Relations Bd.* [1983] 34 Cal.3d 743, 755 [195 Cal.Rptr. 651, 670 P.2d 305].)

 To begin with, it cannot be disputed that the proposal the UFW brought to the April 8, 1982, negotiating session, augmented at its first caucus, and then delivered to Bertuccio through the mediator was, and was intended by the UFW to be, an offer which, in light of previous agreement between the parties on other topics, would have ripened into a collective bargaining agreement if accepted by Bertuccio at that time.

It is also beyond dispute that by his representative's July 25, 1982, telex Bertuccio unequivocally accepted the UFW's April 8 offer. If as of July 25 the offer remained subject to acceptance, then the telex should have given rise to a collective bargaining agreement.

We turn to the contentions advanced by the UFW and the Board to support their argument that the offer was no longer subject to acceptance on July 25. We note at the outset the Board's assertion that Bertuccio rejected the UFW's offer when made, even if supported by the evidence, would not itself establish that the offer could not thereafter be accepted: *Presto Casting, supra,* 708 F.2d 495, makes clear that even a *rejection* by the offeree does not nullify the offer so long as the offer has not been withdrawn and no other enumerated circumstances have intervened. On its facts *Presto Casting* itself is a strong case for the point: The company had made a "final final" offer. The union made two counterproposals each of which the company rejected. The union then expressly rejected the company's offer. Then the union conducted a strike vote and the company's employees went out on strike for a week. At the end of the week the union accepted the company's offer. The company took the position that the counteroffers and rejection, and other intervening circumstances, had nullified the offer. The NLRB found that the offer had still been susceptible of acceptance after the strike; in *Presto Casting* the Ninth Circuit affirmed the NLRB's decision.

a. *Actual Withdrawal.*

The UFW and the Board contend that the UFW did in fact withdraw the offer before its representatives left the April 8 meeting.

The record does not support the contention. Clearly there was no explicit withdrawal; perhaps the strongest evidence for withdrawal was the declaration, attributed to Cesar Chavez and paraphrased by Gega, that "he was going to force the Company to sign a worse contract than the Union was offering." As a matter of law, under the federal precedents the language

attributed to Cesar Chavez falls far short of a statement that the offer was withdrawn.

b. *Unreasonable Delay.*

The essence of the second contention advanced by the UFW and the Board is that because Bertuccio's acceptance—coming some three and one half months after the offer—was unreasonably delayed, Bertuccio should be deemed reasonably to have understood the offer had been withdrawn.

"Where it is conceded that the offer has not been explicitly withdrawn, the correct test for determining whether the offer has lapsed is the reasonable belief of the parties. If one of the parties believes that the offer has lapsed, then it is necessary to consider whether the belief is reasonable, that is, whether circumstances would lead a party to reasonably believe that the offer has expired. [Citation.] Length of time between offer and acceptance is only one of the circumstances to be considered." (*Teamsters Local Union No. 688* v. *N.L.R.B., supra,* 756 F.2d 659, 662.)

There is no evidence either party believed the offer had lapsed. The UFW's proposal remained a reference point in ongoing correspondence between Gega and Paul Chavez between April 8 and July 25: Plainly it remained, and was regarded by both parties, as the last definitive statement of the UFW's position, notwithstanding Bertuccio's intervening counterproposal on July 9.

c. *Unfairness.*

The final contention of the UFW and the Board is that circumstances intervening between offer and purported acceptance would render enforcement of the offer unfair. Under *Pepsi-Cola* the thrust of this contention would be that in light of these circumstances the parties should reasonably have understood that the offer should be deemed withdrawn.

Beyond the broad statement that "a mere change in bargaining strength does not create such unfairness as to negate acceptance" (*Presto Casting Co.* v. *N.L.R.B., supra,* 708 F.2d 495, 498; see *Pepsi-Cola Bottling Co., etc.* v. *N.L.R.B., supra,* 659 F.2d 87, 90), the federal precedents do not establish firm guidelines for a consideration of asserted unfairness. Our own examination of the record in light of general equitable principles persuades us that as a matter of law there was no such change of circumstances relevant to the UFW's April 8 offer as to render its enforcement unfair.

Upon receipt of the Bertuccio telex Paul Chavez and Cesar Chavez talked to Gega by telephone. On the following day Paul Chavez wrote to Gega. The letter alleged changes of circumstance with respect to five topics referred to in the UFW's April 8 proposal:

(1) *Mechanization*: The UFW asserted that since April 8 Bertuccio had "unilaterally mechanized" the apricot harvest, displacing bargaining-unit members.

(2) *Medical plan*: According to the UFW, the plan administrator had informed them the April 8 proposal of a 25 cents per hour employer contribution rate would no longer be sufficient to provide the intended benefits.

(3) *Duration*: The UFW pointed out that of the 12-month period proposed by the UFW in April, nearly 4 months had already passed.

(4) *Wages*: The UFW wage proposals would have gone into effect immediately had the April 8 proposal been accepted when submitted. The UFW took the position unit members had thus suffered economic losses by virtue of Bertuccio's delay.

(5) *Bargaining unit*: On July 9 Bertuccio had offered to abandon his contention that certain Quintero workers should be outside the bargaining unit. Thus (the UFW letter implied) the premise for the UFW's substantial April 8 concession as to five "exclusive crops" no longer existed.

The UFW has also argued that to permit Bertuccio to go back to the April 8 proposal at a time when the UFW's boycott activities had put it in a position to obtain additional concessions "would simply be unfair."

These last two contentions may be dismissed as attempts to invoke "mere change[s] in bargaining strength" (*Presto Casting Co.* v. *N.L.R.B., supra,* 708 F.2d 495, 498), on facts not nearly so strong as those found irrelevant in *Presto Casting*. In *Presto Casting* it was the union that sought to enforce its acceptance of an earlier management offer; in the interim the union had struck the employer and had in effect lost the strike as evidenced by the fact that a majority of the employees had gone back to work. Here the record reflects no more than that, on July 9, Bertuccio had tendered a counterproposal to which the UFW had not responded.

As to mechanization, Bertuccio has plausibly pointed out that the apricot harvest was necessarily mechanized during and because of the UFW's strike and not as a long-term change in Bertuccio's position to the detriment of the bargaining unit. The UFW's remaining concerns lent themselves to

straightforward adjustment in the process of putting the collective bargaining agreement into final form. For example, the record contains evidence that Bertuccio promptly agreed, subject to verification of the UFW's representations, to increase his agreed rate of contribution to the medical plan. We conclude as a matter of law that there is no showing of circumstances which would render enforcement of the UFW's April 8 proposal on the basis of Bertuccio's July 25 acceptance unfair to the bargaining unit or to the UFW.

We therefore conclude that Bertuccio's July 25 acceptance was effective and should have given rise to a collective bargaining agreement based on the UFW's April 8 proposal in light of previous agreement between the parties as to other topics.

The relevance of our conclusion to the issues before us is that Bertuccio should in no event be required to pay makewhole, in H000351, for any period after July 24, 1982. Bertuccio's acceptance was, in our view, a manifestation of good faith. That we cannot now determine whether Bertuccio would thereafter have maintained good faith in his dealings with the bargaining unit and the UFW is due to the UFW's wrongful refusal to enter into a collective bargaining agreement upon receipt of Bertuccio's acceptance. In the circumstances we must give Bertuccio the benefit of any doubt.

### D. ISSUES COMMON TO H000334 AND H000351

1. *Bertuccio's Responses to Requests for Information.* *

. . . . . . . . . . . . . . . . . . . . . .

2. *Unilateral Wage Increases.*

In July 1979 and in July 1980 (H000334), and again in January 1982 (H000351), Bertuccio unilaterally raised his employees' wages by 25 cents an hour. In each instance the Board concluded that Bertuccio had been guilty of an unfair labor practice.

In the collective-bargaining context a unilateral change in wages, even though it effects an *increase* in employees' pay, may (if not preceded by a reasonable opportunity for the union to bargain on behalf of the represented employees, and if no exception applies) be deemed a per se refusal to bargain and thus an unfair labor practice. (Lab. Code, § 1153, subd. (e); cf.

---

* See footnote, *ante,* at page 1369.

National Labor Relations Act (NLRA), § 8(a)(5), 29 U.S.C. § 158(a)(5).) Because the unilateral change directly affects wages, this is a considerably clearer case than that of unilateral "business decisions," discussed above.

An employer will sometimes assert that (for example) a unilateral wage increase has been granted in accordance with a long-standing company practice of granting such raises at regular intervals or in specified circumstances: In this sense, the argument runs, by granting "traditional" raises the employer is simply maintaining the "dynamic status quo." (*Cardinal Distributing Co.* v. *Agricultural Labor Relations Bd.* [1984] 159 Cal.App.3d 758, 770-771 [205 Cal.Rptr. 860]; *Labor Board* v. *Katz* (1962) 369 U.S. 736, 746 [8 L.Ed.2d 230, 237-238, 82 S.Ct. 1107].)

The union may waive the impropriety expressly, by inaction with knowledge, or in other ways. (1 Morris, The Developing Labor Law (2d 1983) pp. 640-650; cf. *N.L.R.B.* v. *Henry Vogt Mach. Co.* (6th Cir. 1983) 718 F.2d 802, 806-807.)

The unilateral raises are conceded. In each instance Bertuccio asserted that the raise was consistent with long-standing company practice and simply maintained the "dynamic status quo." In H000334 Bertuccio added an argument that the UFW had waived any objection.

In H000334 the administrative law officer (ALO) rejected Bertuccio's waiver argument on credibility grounds and concluded the raises would not come within the "dynamic status quo" exception: Although given at the 25-cent rate in 1977, 1978, 1979, and 1980, the raises had "varied in other years" and once had not been given at all, that there was no credible evidence of automatic raises in piece rates, and (in sum) that Bertuccio's "policy of wage increases left wide open to its own discretion if wages were to be raised and how much." The Board tacitly adopted the ALO's findings and conclusions.

In H000351, the Board accepted the ALJ's conclusion that the "dynamic status quo" issue had been conclusively resolved in H000334.

■ It is true that "[c]redibility of witnesses is particularly for the Board's determination and is not reviewable by the court unless the testimony is incredible on its face or inherently improbable. [Citations.]" (*Jasmine Vineyards, Inc.* v. *Agricultural Labor Relations Bd.* [1980] 113 Cal.App.3d 968, 976 [170 Cal.Rptr. 510].) But it is also true that in evaluating sufficiency of evidence we are obliged to assess the entire record. (*Carl Joseph Maggio, Inc.* v. *Agricultural Labor Relations Bd.* [1984] 154 Cal.App.3d 40, 54-55 [201 Cal.Rptr. 30].) " 'Whether or not it was ever permissible for courts to determine the substantiality of evidence supporting a Labor Board decision merely on the basis of evidence which in and of

itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn, the new legislation definitively precludes such a theory of review and bars its practice. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. . . .'" (*Id.* at p. 54, quoting from *Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474, 487-488 [95 L.Ed.2d 456, 467, 71 S.Ct. 456].) ■ In light of this standard we must accept the Board's conclusion that the UFW had not waived its objection.

The status-quo issue is more difficult, but the law and the record sustain the Board's conclusion in H000334.

■ The weight of both federal and California authority is that it is insufficient for the employer to show that rhythmic raises were *customary*: That to validate what would otherwise, in the circumstances, be a forbidden unilateral wage increase the employer must show that the change was essentially *automatic* and involved no exercise of discretion by the employer. (*Labor Board* v. *Katz, supra,* 369 U.S. 736, 746-747 [8 L.Ed.2d 230, 237-238]; cf. *N.L.R.B.* v. *J. P. Stevens & Co., Inc., Gulistan Div.* (5th Cir. 1976) 538 F.2d 1152, 1162; *N.L.R.B.* v. *Allis-Chalmers Corp.* (5th Cir. 1979) 601 F.2d 870, 875-876; cf. also *N.L.R.B.* v. *Crystal Springs Shirt Corp.* (5th Cir. 1981) 637 F.2d 399, 403-404; *Cardinal Distributing Co.* v. *Agricultural Labor Relations Bd., supra,* 159 Cal.App.3d 758, 770-771; *George Arakelian Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1986) 186 Cal.App.3d 94, 106 [230 Cal.Rptr. 428]; but see *Aaron Bros. Co., a Div. of Chromalloy* v. *N.L.R.B.* (9th Cir. 1981) 661 F.2d 750, 753; *Queen Mary Restaurants Corp.* v. *N.L.R.B.* (9th Cir. 1977) 560 F.2d 403, 408.)

■ We agree with *Cardinal Distributing* that the law requires the employer to carry " 'a heavy burden of proving that such adjustments of wages . . . are purely automatic and pursuant to definite guidelines.' " (159 Cal.App.3d at p. 771.) In H000334 the ALO and the Board concluded that Bertuccio did not bear his burden in this case. Although on the factual record the question is close, we will not disturb the Board's determination.

We further agree with the Board that resolution of the "dynamic status quo" issue in H000334 compels a similar resolution in H000351.

3. *Surface Bargaining.* *

. . . . . . . . . . . . . . . . . . . . .

---

* See footnote, *ante,* at page 1369.

### 4. *Union Conduct.*

 "Before finding a failure to bargain in good faith, the 'totality of the employers' conduct' must be examined; this includes a consideration of the union's conduct. [Citations.]" (*Carl Joseph Maggio, Inc.* v. *Agricultural Labor Relations Bd., supra,* 154 Cal.App.3d 40, 71; cf. *Wald Manufacturing Company* v. *N.L.R.B.* (6th Cir. 1970) 426 F.2d 1328, 1331-1332.)

In both H000334 and H000351 Bertuccio cited the conduct of the UFW and its individual members in bar or in mitigation of the charges against it or the remedies ordered.

In this court Bertuccio argues that the bad-faith bargaining defense should be accorded particular significance under the ALRA.

### a. *H000334.* *

. . . . . . . . . . . . . . . . . .

### b. *H000351.*

In H000351 as in H000334, Bertuccio contended the UFW had manifested bad faith in the negotiating process in various ways.

### 1) *Delay.* *

. . . . . . . . . . . . . . . . . .

### 2) *Union Walkouts.* *

. . . . . . . . . . . . . . . . . .

### 3) *Rejection.* *

. . . . . . . . . . . . . . . . . .

---

\* See footnote, *ante,* at page 1369.

4) *Violence.*

Bertuccio's remaining contention in this court is that the ALJ should have received and considered evidence of serious strike misconduct by Bertuccio employees closely aligned with the UFW. In essence he asserts that the UFW strikers "mount[ed] a campaign of violence" which as a matter of sound policy should not be encouraged, and that the violence was so severe as to constitute a complete defense to the charges against him but in any event should have been considered on the question whether make-whole should have been ordered.

To buttress his position Bertuccio has asked this court to take judicial notice of documents from other proceedings before the Board, ostensibly to show both the fact and the content of charges of UFW violence and bad faith. Although the requests are most apparently relevant to H000351, Bertuccio makes them in all four pending proceedings. We deny the requests on the ground that these matters were not before the ALJ or the Board in the administrative proceedings and accordingly are not properly before us for review.

Bertuccio's attempt to present evidence of violence before the ALJ was rejected at the beginning of the ALJ hearing. Bertuccio had alleged "acts of violence against Bertuccio Farms," by the UFW through several named "agents," as one of several affirmative defenses to the regional director's complaint. The UFW moved to strike the affirmative defense. In the course of two hearings on the motion Bertuccio made an offer to prove specified acts of violence, by strikers identified as union activists, and argued the evidence would be relevant and admissible to prove union violence on either of two theories:

(1) As a complete defense to the charge that Bertuccio had failed to negotiate in good faith; and

(2) As a factor to be considered on the question whether Bertuccio (in the event he were found to have failed to negotiate in good faith) should be required to make his employees whole.

The ALJ struck the affirmative defense for all purposes. He reasoned that sufficiently serious union violence might be a defense to a charge that management had *refused* to bargain, if (but only if) there had in fact been a refusal attributable to the violence, but that in this case it appeared Bertuccio had never refused to bargain but instead had continued to come to the table. With respect to makewhole, the ALJ took the position that union violence would not in any event bar makewhole completely, but should be

proved (if at all) at a subsequent compliance hearing on the issue of the *amount* of makewhole to be ordered.

In light of this ruling no evidence of union violence was tendered at the ensuing ALJ hearing, and the violence issue was mentioned in neither the ALJ's decision nor the decision and order of the Board.

In this court Bertuccio attacks both aspects of the ALJ's ruling.

We conclude the ALJ was correct in his determination that Bertuccio's offer of proof would not have constituted a complete defense to the unfair-labor-practice charges pending against Bertuccio. We base our conclusion on the lack of any evidence, or offer of proof, that the conduct of individual strikers had had any impact whatsoever, one way or another, on Bertuccio's participation in the bargaining process.

But we also conclude that the evidence was relevant, and should have been received and considered, on the question whether Bertuccio should ultimately have been required to pay makewhole. We shall discuss this conclusion further in the context of the makewhole order.

5. *Makewhole.*

In each of these matters the Board ordered relief including makewhole. Bertuccio challenges the makewhole orders. In each matter there are, broadly, three issues:

(1) Was makewhole properly ordered in the circumstances of record?

(2) Was the Board's order that interest on makewhole be computed on a sliding scale (keyed to the prime rate), under *Lu-Ette Farms, Inc.* (1982) 8 ALRB No. 55, proper?

(3) Must the makewhole order in any event be remanded to the Board for further proceedings under new procedural rules stated in *Dal Porto II*?

 The ALRA's provision for "making employees whole, when the board deems such relief appropriate, for the loss of pay resulting from the employer's refusal to bargain" (Lab. Code, § 1160.3) has both compensatory and dissuasive functions: It is "compensatory in that it reimburses employees for the losses they incur as a result of delays in the collective bargaining process." (*J. R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 36 [160 Cal.Rptr. 710, 603 P.2d 1306].) At the same time "it . . . reduces the employer's financial incentive for refusing to

bargain in order to avoid the expenses he would be required to pay if he had entered into a collective bargaining agreement." (*Id.* at p. 31, citing federal cases; cf. *Dal Porto II, supra,* 191 Cal.App.3d at p. 1204.)

We shall consider the three makewhole issues in reverse order.

a. *Findings and Burden Under Dal Porto II.*

On the face of the statute, the makewhole concept necessarily assumes the employees would have been paid but for the grower's conduct. In a refusal-to-bargain case, the rational link between bargaining and more pay is a further assumption that good faith bargaining would have led to a collective bargaining agreement for higher pay. In refusal-to-bargain cases before *Dal Porto II,* the Board had presumed that good faith bargaining would result in a collective bargaining agreement and thus had based makewhole awards directly upon findings that a grower had *not* bargained in good faith, without inquiring whether in fact there would have been an agreement if the grower *had* bargained in good faith. (Cf. *Adam Dairy* (1978) 4 ALRB No. 24.)

This approach was rejected in *Dal Porto II,* a refusal-to-bargain case in which the Court of Appeal held that makewhole relief may be imposed only where the Board has made a finding that the parties would have entered into a collective bargaining agreement for higher pay *but for* the grower's refusal to bargain. (191 Cal.App.3d at pp. 1200, 1205, 1207.) The Board's general counsel has the initial burden of producing evidence to show the grower unlawfully refused to bargain. But "the employer must bear the consequence of its illegality by proving it had no effect on the failure to conclude a collective bargaining agreement. Thus, once the Board produces evidence showing the employer unlawfully refused to bargain, the burden of persuasion shifts to the employer to prove no agreement calling for higher pay would have been concluded in the absence of the illegality. . . . If the employer fails to carry its burden in this regard, the Board is entitled to find an agreement providing for higher pay would have been concluded in the absence of the employer's refusal to bargain. The Board should then *impute* to the parties an 'agreement' and to measure losses of pay and benefits with reference to the *imputed contract.* [Citations.]" (191 Cal.App.3d at pp. 1208-1209.) It appears that the "imputed contract" may be inferred from "comparable contracts actually negotiated" by the union with other growers. (191 Cal.App.3d at p. 1212.)

It is clear that in H000334 and H000351 the Board did not follow the procedure subsequently spelled out in *Dal Porto II.* It is also clear Bertuccio

adequately anticipated and preserved these issues, both before the Board and in this court.

We agree with the reasoning of *Dal Porto II*. Upon remand of both H000334 and H000351 to the Board for this and other purposes we shall direct further consideration of makewhole in light of *Dal Porto II*. We have already concluded that the Board has produced evidence to show Bertuccio unlawfully refused to bargain. In each matter, on remand the Board shall set aside its makewhole order and shall afford Bertuccio an opportunity to present legal argument before the Board makes its new decision as to makewhole relief. Bertuccio may also ask leave to present additional evidence, limited to the issue whether an agreement calling for higher pay would have been concluded in the absence of Bertuccio's unlawful refusal to bargain, in order to bear his burden of persuasion, and shall support any such request by a written offer of proof detailing any additional evidence Bertuccio may wish to present. Thereafter the Board shall exercise its discretion whether to allow additional evidence. (*Dal Porto II,* 191 Cal.App.3d at p. 1214.) The Board's discretion shall be limited to the questions whether the evidence set forth in the offer of proof (1) is relevant and (2) is not simply cumulative of evidence already in the record filed with the Board. If both questions are answered affirmatively the additional evidence, and any evidence responsive to it which meets the same standards, shall be admitted and considered by the Board.*

b. *Interest Rate.*

In both H000334 and H000351 the Board ordered that its makewhole remedy bear interest "computed in accordance with our Decision and Order in *Lu-Ette Farms, Inc.* . . . ," which is to say 100 percent of the prime rate quoted by commercial banks to large business, as determined by the Board of Governors of the Federal Reserve System, adjusted annually. (*Lu-Ette Farms, Inc., supra,* 8 ALRB No. 55, pp. 5-7, relying on *Florida Steel Corporation* (1977) 231 NLRB 651, 651-652.)

The *Lu-Ette Farms* computation has been attacked by growers, and is attacked by Bertuccio in this case, on the ground that the computation

---

* We do not read *Dal Porto II* to suggest that a grower would be required to make an offer of proof in an ALJ hearing conducted after *Dal Porto II* was final. In a post-*Dal Porto II* hearing, the grower would presumably introduce such evidence as he has. The offer of proof procedure *Dal Porto II* suggests is appropriate only to the situation, in that case and in this, where the grower considers it necessary to reopen a record previously filed with the Board in order to add relevant evidence. We also do not read *Dal Porto II* as suggesting that the Board has the discretion to deny leave to reopen in the face of a legally sufficient and noncumulative offer of proof.

would violate the interest-limitation provisions of article XV, section 1, of the California Constitution.

The arguments on which Bertuccio relies have been discussed at length, and rejected, in *Sandrini Brothers* v. *Agricultural Labor Relations Bd.* (1984) 156 Cal.App.3d 878, 882-883, 888, 889 [203 Cal.Rptr. 304]. (See also *J. R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1987) 192 Cal.App.3d 874, 899-902 [238 Cal.Rptr. 87].) We agree with the *Sandrini Brothers* analysis; we are satisfied that in each matter the Board's interest order was proper.

### c. *Board Discretion.*

Even if the procedural requirements of *Dal Porto II* are met the Board may not order makewhole remedies reflexively. ■ The Board must consider the facts and equities of the case before it; its makewhole order must reflect exercise of sound discretion. (*J. R. Norton Co.* v. *Agricultural Labor Relations Bd., supra,* 26 Cal.3d 1, 30-38; *Lindeleaf* v. *Agricultural Labor Relations Bd.* (1986) 41 Cal.3d 861, 880-881 [226 Cal.Rptr. 119, 718 P.2d 106]; *Rivcom Corp.* v. *Agricultural Labor Relations Bd., supra,* 34 Cal.3d 743, 772.)

So long as the Board can be perceived to have exercised its discretion, the scope of its discretion, within its area of presumed administrative expertise, is broad and a reviewing court's role is said to be correspondingly limited: "In general, the board's remedial order 'should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can be fairly said to effectuate the policies of the Act.' [Citations.]" (*Carian* v. *Agricultural Labor Relations Bd.* (1984) 36 Cal.3d 654, 674 [205 Cal.Rptr. 657, 685 P.2d 701]; cf. also *Karahadian Ranches, Inc.* v. *Agricultural Labor Relations Bd.* (1985) 38 Cal.3d 1, 16 [210 Cal.Rptr. 657, 694 P.2d 770].)

### 1) *H000334.*

In pertinent part the makewhole order in H000334 required that Bertuccio "Make whole all agricultural employees employed by [Bertuccio] at any time between January 22, 1979, and September 8, 1980, and from September 9, 1980, to the date [Bertuccio] commences good-faith bargaining with the UFW which leads to a contract or a bona fide impasse, for all losses of pay and other economic losses sustained by them as the result of [Bertuccio's] refusal to bargain, such losses to be computed in accordance with this Board's precedents . . . ."

The Board also ordered makewhole based on its determination that Bertuccio had been required to bargain at least the effects of his decision to sell the garlic crop for seed. Since we shall annul that determination we shall also strike so much of the makewhole order as relates directly to the sale of the garlic crop.

Bertuccio argues that the makewhole remedy "is entirely inappropriate" in the circumstances of this case. He does not appear to argue that the Board failed to consider the facts and equities of H000334. Rather, he contends in necessary effect that the Board grossly abused its discretion. In essence he reargues the underlying merits, asserting that he did not bargain in bad faith and that the UFW's insistence on an illegal provision suspended Bertuccio's duty to bargain.

On its face Bertuccio's argument begs the question whether he had been guilty of unfair labor practices. We have concluded the record supports the Board's determination that he had. Turning to the question of appropriate remedies for the unfair labor practices, we find in the H000334 record no showing of gross union misconduct comparable to the allegation of serious strike violence in H000351: We are satisfied the Board has exercised sound discretion and sufficiently balanced the equities. Assuming the Board were to find an agreement would have been consummated but for Bertuccio's unfair practices, a makewhole remedy would be justified. (*Dal Porto II, supra,* 191 Cal.App.3d 1195, 1215.)

### 2) *H000351.*

The makewhole order in H000351 required among other things that Bertuccio "Make whole its present and former agricultural employees, including employees who went out on strike on or about July 10, 1981 but not including employees hired after July 10, 1981, as replacements for those strikers, for all losses of pay and other economic losses sustained by them as the result of [Bertuccio's] refusal to bargain . . . . The period of said makewhole obligation shall extend from April 2, 1981 until July 24, 1982 and thereafter, until Respondent commences good faith bargaining with the UFW which results in a contract or bona fide impasse. The computation of the makewhole award for an employee who went on strike on or about July 10, 1981 shall not include actual wages or benefits received for the period from July 10, 1981 or such later date as the employee went on strike to either the date such employee unconditionally returned or offered to return to work or the date Respondent commences good faith bargaining with the UFW resulting in contract or bona fide impasse, whichever date comes first. Rather the makewhole award for such an employee shall include the difference between what such employee would have earned by working for

Respondent during said period and what the employee would have earned by working during the same period at rates of payment which Respondent would have been paying had he been bargaining in good faith. (See *Admiral Packing Company* (1981) 7 ALRB No. 43.)"

In H000351, as in H000334, Bertuccio argues that the makewhole remedy is inappropriate. Again he essentially reargues the merits, asserting

(a) That it was the UFW that was in bad faith and that he was not. He adds arguments

(b) That makewhole should not be awarded to laborers who voluntarily went on strike;

(c) That the makewhole remedy has an impermissible tendency to "intrude into the bargaining process";

(d) That the period between September 9, 1980, and April 1, 1981, "was not litigated" and therefore that makewhole cannot be awarded for that period; and

(e) That the Board improperly reserved for future determination, implicitly in these same proceedings, whether Bertuccio bargained in bad faith after July 24, 1982.

### a) *Balancing the Equities.*

 Bertuccio argues that in this case the Board "failed to balance the equities in an accurate and even-handed fashion. . .": "First, Bertuccio did not bargain in bad faith. Second, assuming arguendo, [Bertuccio's] conduct was less than exemplary, the UFW failed to bargain with *clean hands.*" Bertuccio cites asserted instances of UFW misconduct both at the bargaining table and in the form of strike violence.

We have already concluded that the record sufficiently supports the Board's findings that Bertuccio did indeed bargain in bad faith. Whether or not makewhole is in the nature of a purely *equitable* remedy to which conceptualizations such as "clean hands" would apply, the caselaw makes clear that in any event the Board must consider the *equities* of the parties' positions in determining whether makewhole should be ordered. If the *union* engaged in, or condoned, serious strike violence in the course of negotiations, the equities of the union's position would be correspondingly diminished and the fact of violence should have been taken into account in determining whether to order makewhole.

It follows that the ALJ erred when he excluded evidence of strike violence insofar as the evidence would have been relevant to the makewhole order. On remand the Board should receive such evidence as Bertuccio may see fit to present, relevant to the period from April 1981 to July 25, 1982, on two issues:

(1) Whether there were serious acts of violence in the course of the UFW strike or otherwise relevant to the labor negotiations between the parties; and

(2) Whether any such violence could be attributed to the UFW itself, as distinct from individual union members. Obviously the independent acts of individual strikers, not rationally attributable to the UFW by direct or circumstantial evidence of union incitement, condonation, or ratification, would not be relevant to the equities as between Bertuccio and the UFW. That an individual has been given or has assumed a leadership position in union activities is a factor to be taken into consideration in determining whether his violence can be attributed to the union.

The Board should then reconsider its decision to order makewhole in light of the evidence thus taken.

b) *Makewhole for Strikers.*

 Bertuccio acknowledges that the Board's formulation of makewhole for "an employee who went on strike on or about July 10, 1981" is consistent with Board policy declared in *Admiral Packing Company* (1981) 7 ALRB No. 43 and reiterated in subsequent Board decisions. In essence he attacks *Admiral Packing Company,* arguing that its rule as announced was "startling and novel" and was inconsistent with the federal rule that, in general, a striker will not be entitled to back pay for the time he or she is on strike; he cites *Kohler Co.* (1960) 128 NLRB 1062, 1110.

On a superficial level federal back pay decisions are not directly relevant to makewhole under the ALRA: While each remedy is designed to provide relief to an employee who has been denied economic benefits in violation of the labor laws, in theory and in application the remedies are distinct. Broadly, back pay is intended to compensate an employee whose opportunity to earn his or her previously established pay and benefits has been improperly denied or limited, and is measured by the preexisting rates. (See generally 2 Morris, The Developing Labor Law, *op. cit. supra,* pp. 1658-1659.) Equally broadly, makewhole is designed to give an employee the benefit of a collective bargaining agreement that would have been entered into but for the unfair labor practices of either the employer or the

union, and is measured by the rates of pay and benefits the collective bargaining agreement would have provided. (See generally *Highland Ranch* v. *Agricultural Labor Relations Bd.* [1981] 29 Cal.3d 848, 866, fn. 7 [176 Cal.Rptr. 753, 633 P.2d 949].)

Both the NLRA and the ALRA expressly provide for a back pay remedy. (NLRA § 10(c), 29 U.S.C. § 160(c); Lab. Code, § 1160.3.) But while make-whole is not expressly provided for under the federal statute, and is used only in limited circumstances (cf. *Highland Ranch* v. *Agricultural Labor Relations Bd., supra,* 29 Cal.3d 848, 866, fn. 7), "the drafters of the ALRA inserted specific language in [Labor Code] section 1160.3 to make it clear that under the California act the [Board] is authorized to impose this somewhat controversial remedy." (*Id.* at p. 866.)

The federal rule that, in general, a striker will not be entitled to *back pay* for the time he or she was on strike makes sense on an economic level: If an employee elects to strike rather than to work, arguably he or she should not be paid for working, either at the time or retroactively by way of a back pay order.

In *Admiral Packing* the Board recognized the federal back pay rule and apparently acknowledged its economic rationale. But as to make-whole, the Board concluded that workers who strike in response to an employer's unfair labor practices (as distinct from "economic strikers" who simply strike for better working conditions) should be entitled to that relief to the extent of the difference between the wages they voluntarily gave up to strike and wages they would have received (under an anticipated collective bargaining agreement) but for the employer's unfair practices. The Board tendered two rationales for its rule: First, the ALRA expressly provides that (without relevant exception) it shall not be construed "so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on such right." (Lab. Code, § 1166.) The Board believed "that the intent of the Legislature in enacting this section would be thwarted if our make-whole award completely excluded employees who exercised their right to go on strike." (*Admiral Packing Company, supra,* 7 ALRB No. 43, p. 28.)

Second, "[i]n so structuring the award of make-whole for employees who went on strike we prevent Respondent Employers from enjoying the unjust enrichment which would otherwise accrue to them as a result of their misconduct. In the absence of this award of partial make-whole to employees who went on strike their employers would profit from their violation of the Act in the amount that the wages they paid to employees hired to replace strikers fell short of the wages they would have paid employees under the contracts which likely would have been reached if the employers

had bargained in good faith." (*Id.* at pp. 28-29, fn. omitted.) The Board acknowledged the appearance of "a certain anomaly in awarding as makewhole an incremental wage to employees who were not earning regular wages because they were on strike," but stated its belief that "such an anomaly represents a 'lesser evil' than the burden on the statutorily protected right to strike and the unjust enrichment of Respondent Employers from their misconduct which would result if striking employees were entirely excluded from the makewhole award." (*Id.* at p. 29, fn. 10.)

*Admiral Packing* was reviewed in *Carl Joseph Maggio, Inc.* v. *Agricultural Labor Relations Bd., supra,* 154 Cal.App.3d 40, but the Court of Appeal determined there had been insufficient evidence of an unfair labor practice and did not reach the makewhole issue. So far as we have been advised or can determine, no California reviewing court has addressed *Admiral Packing*'s makewhole rule.

We believe that the *Admiral Packing* rule cannot be supported as a matter of sound policy. We concur in one federal court's statement of the policy predicate for the federal rule, which the Board in *Admiral Packing* apparently overlooked: "The [NLRB]'s policy not to award backpay to unfair labor practice strikers rests upon the assumption that the purposes of the Act are best served by encouraging employees to redress unfair labor practices through administrative process rather than industrial strife." (*Intern. U. of Elec., Radio & Mach. Wkrs.* v. *N.L.R.B.* (1979) 604 F.2d 689, 697 [196 App.D.C. 25].) The federal court quoted with approval a trial examiner's statement adopted by the NLRB in *Comfort, Inc.* (1965) 152 NLRB 1074, 1090: " 'To require the employer to pay backpay for the period of the strike is . . . to "subsidize" the strike. . . . Even if the sole cause of the strike is an unfair labor practice, . . . the Board's machinery should be used to remedy the underlying unfair labor practice without underwriting the strikers' withholding of their labor to effectuate that result.' " (604 F.2d at p. 697.) We note that this policy has been articulated in the face of an NLRA right-to-strike provision all but identical to Labor Code section 1166. (NLRA § 13, 29 U.S.C. § 163.)

We conclude that makewhole is not available to an employee for any period during which he was on strike. We shall direct reconsideration of the makewhole order in H000351 accordingly.

c)-e)*

. . . . . . . . . . . . . . . . . . . . .

___

*See footnote, *ante,* page 1369.

## II.*

. . . . . . . . . . . . . . . . . . . . .

## III. *H000302*

In June 1982, shortly before the ALJ hearing in H000351 began, the UFW-sanctioned strike against Bertuccio ended and a number of employees offered to return to work. Most were rehired; a few were not.

A few months later, in November 1982, Bertuccio ordered lettuce harvesters to work in the rain, at variance with what the UFW perceived to have been his previous policy, and suspended approximately 15 of them for a day when they refused to do so.

These incidents gave rise to proceedings in which the Board ultimately concluded (in *Bertuccio Farms* (1984) 10 ALRB No. 52) that Bertuccio had been guilty of unfair labor practices:

(1) By refusing to rehire Javier Ceja (the union activist also involved in H000352) when he offered to return to work at the end of the strike;

(2) By unilaterally changing the previous policy of permitting lettuce harvesters to stop working when it rained; and

(3) By suspending employees for refusing to cut the lettuce in the rain.

The Board ordered remedies including makewhole. By this petition Bertuccio challenges each of the Board's three conclusions. We shall annul the decision and order in its entirety.

### A. CEJA

Ceja had worked for Bertuccio for several years; he was, and was known to Bertuccio to be, a leader of union activities among Bertuccio's employees. In the course of a UFW-sanctioned strike that began in July 1981 and continued until June 1982, Ceja engaged in strike-related misconduct for which he was convicted of several misdemeanors: On August 1, 1981, Ceja threw multipointed "tire spikes" in front of vehicles used to transport non-striking workers. On August 17 he kicked the car of a Quintero worker, damaging it, as she was driving away from her workplace; he also called her "Quintero's whore." On September 10, 1981, he threw a rock at a pickup truck driven by a Bertuccio supervisor, striking the truck. On September 23,

---

*See footnote, *ante*, page 1369.

1981, Ceja threw a tire spike in front of a Bertuccio tractor being driven by a Quintero worker, damaging a tire. In November 1981 a jury found Ceja guilty of misdemeanor charges based on these incidents.

The strike ended in June 1982. A number of Bertuccio employees, including Ceja, offered unconditionally to return to work. Several of the employees were reinstated; others, including Ceja, were not. Bertuccio has stipulated that a job was available for Ceja.

Bertuccio's refusal to reinstate Ceja and others was made the subject of a complaint of unlawful discrimination (Lab. Code, § 1153, subd. (c)). Ultimately the Board found such discrimination only as to Ceja, and only Ceja's case is before us.

 The evidence at the ALJ hearing relevant to Ceja was for the most part uncontradicted. In addition to the facts stated above it was made to appear that at relevant times Bertuccio denied reinstatement to individuals who had been charged with felonies, but reinstated two individuals each of whom had been convicted of a single misdemeanor and also reinstated other employees who had been active, although probably not as active as Ceja, in the union. The parties disagree as to whether the evidence establishes firm Bertuccio reinstatement policies which might or might not have been violated in Ceja's case. In our view the record makes clear that while Bertuccio had a policy against reinstating persons charged with strike-related felonies, he did not have a firm policy of reinstating anyone who had *not* been so charged. The parties also disagree as to the effect of evidence of Bertuccio's motive for refusing to reinstate Ceja. There is substantial evidence that Bertuccio was motivated *both* by Ceja's union activities and by his strike-related misconduct.

In the circumstances of record Ceja would have been entitled to reinstatement, absent either clear business justification or a showing of strike-related misconduct. (Cf. generally *NLRB* v. *Fleetwood Trailer Co.* (1967) 389 U.S. 375 [19 L.Ed.2d 614, 88 S.Ct. 543]; *Labor Board* v. *Fansteel Corp.* (1939) 306 U.S. 240 [83 L.Ed. 627, 59 S.Ct. 490, 123 A.L.R. 599]; *Labor Board* v. *Mackay Co.* (1938) 304 U.S. 333 [82 L.Ed. 1381, 58 S.Ct. 904]; *Advance Ind. Div.-Overhead Door* v. *NLRB* (7th Cir. 1976) 540 F.2d 878.) A fortiori Ceja could not have been refused reinstatement solely on the basis of his protected union activities.

Bertuccio relied on no business justification other than that implicit in his allegation that Ceja had been guilty of serious strike-related misconduct. The Board found that Bertuccio "did not have a good faith belief that Javier Ceja had engaged in serious strike misconduct," and thus that for want of

"a legitimate and substantial business justification" Bertuccio's refusal to rehire Ceja had been an unfair labor practice. In the Board's view Bertuccio "denied consideration of reinstatement to Ceja because of his protected concerted activities, not because of his alleged strike misconduct." The Board ordered Bertuccio to reinstate Ceja and to make him whole "for all losses of pay and other economic losses he has suffered as a result of his denial of rehire . . . ."

The record before us provides no support for the Board's conclusion. To the contrary, the record establishes as a matter of law that Ceja had been guilty of serious strike-related misconduct and that Bertuccio's decision not to reinstate him was based at least in part upon Bertuccio's accurate and good-faith perception of that fact.

At best the Board might have sought to rationalize its conclusion in terms of the so-called "dual motive" rules applicable to a situation in which an employer subject to the labor statutes "was motivated by both an antiunion bias and legitimate business interests in discharging an employee . . . ." (*Martori Brothers Distributors* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 721, 729 [175 Cal.Rptr. 626, 631 P.2d 60]; cf. also *Kawano, Inc.* v. *Agricultural Labor Relations Bd.* (1980) 106 Cal.App.3d 937, 952 [165 Cal.Rptr. 492].) Substantively, these rules provide "[w]hen it is shown that the employee is guilty of misconduct warranting discharge, the discharge should not be deemed an unfair labor practice unless the board determines that the employee would have been retained 'but for' his union membership or his performance of other protected activities." (*Martori Brothers Distributors* v. *Agricultural Labor Relations Bd., supra,* 29 Cal.3d 721, 730.) Procedurally, the employee has the initial burden of showing that protected activities were a motivating factor in the decision to discharge him or; if he or she bears the initial burden, "the burden shifts to the employer to show that discharge would have occurred in any event. If the employer fails to carry his burden in this regard, the board is entitled to find that discharge was improper." (*Ibid.*; cf. *Wright Line* (1980) 251 NLRB 1083; *NLRB* v. *Transportation Management Corp.* (1983) 462 U.S. 393, 402-404 [76 L.Ed.2d 667, 675-677, 103 S.Ct. 2469].) Upon the hypothesis that in this case the Board applied these rules to the facts of record, the Board's conclusion might be understood as a determination that the general counsel, in behalf of Ceja and the UFW, had made a showing sufficient to shift the burden to Bertuccio and that Bertuccio had then failed to bear his burden. There is no indication, either in the Board's decision and order or in the ALJ's decision it incorporates, that the Board intended to invoke the dual motive rules. Even if it had, the record would compel as a matter of law the conclusion that Bertuccio had proved Ceja would have been denied reinstatement without reference to his protected activities.

Rather than to attack the Board's findings of illegal discrimination direct-ly, Bertuccio has elected in this court to focus upon the Board's remedial order which requires him to reinstate Ceja and to make Ceja whole. Bertuc-cio invokes recent NLRB decisions for the proposition that whether or not there has been illegal discrimination, a worker who has been guilty of serious misconduct may in the Board's discretion be denied reinstatement and back pay remedies. (*Roure Bertrand Dupont, Inc.* (1984) 271 NLRB 443, 444-445; see also *Clear Pine Mouldings, Inc.* (1984) 268 NLRB 1044.) The necessary extension of Bertuccio's argument would be that even if an illegal discrimination against Ceja were assumed, it was a manifest abuse of the Board's discretion to order reinstatement and makewhole for Ceja in the face of a clear showing of serious strike misconduct.

Were it necessary for us to reach the issue of remedies we would agree with Bertuccio. As we have indicated, we conclude that the issue need not be reached because it is clear as a matter of law, from the evidence of record, that Bertuccio was not guilty of illegal discrimination.

The essence of the argument raised, by the UFW and the Board, against the conclusion we have reached is that Bertuccio's disparate treatment of employees whose situations were similar to Ceja's make clear that Ceja had been impermissibly singled out on the basis of his union activities. We cannot agree: Ceja's repeated acts of strike-related violence toward persons and property plainly distinguish his situation from those of two employees reinstated despite single misdemeanor convictions for far less serious mis-conduct. We are no more precluded than was Bertuccio from looking be-hind the misdemeanor label to assess the nature of the individual's miscon-duct. Bertuccio's refusal to reinstate Ceja was justifiable as a matter of law.

### B. LETTUCE HARVESTERS

There is no apparent dispute over the facts that on two occasions in November 1982 Bertuccio, at variance with his past practice, insisted that workers cut lettuce in the rain, and that on the first occasion he imposed a one-day suspension on workers who refused to do so. There was evidence that Bertuccio's workers had been permitted to stop harvesting lettuce when it rained, although they would continue to work harvesting anise and cardone (taller crops which did not require so much stooping) in the rain. On the first occasion in November 1982 rain began to fall and the lettuce harvesting crew stopped working. Bertuccio supervisors told the workers to continue to work. Some 15 workers stopped working; 9 or 10 others continued to work. When the 15 workers came to the fields the following day they were told there was no work for them: Bertuccio "only wanted the ones who had continued to work during the rain." On the

following day the 15 were permitted to return to work. A second stoppage, for less than a full day, occurred later in November. The day following the second stoppage the workers were assembled and told, in essence, that if in future they refused to cut lettuce simply because it was raining they would be fired.

There was evidence that Bertuccio and his supervisors believed, at the time of the work stoppages, that it was necessary to continue to cut lettuce in order to meet customers' orders for lettuce.

The Board affirmed "the ALJ's conclusion that by imposing a new requirement that workers cut lettuce in the rain, [Bertuccio] made an unlawful unilateral change in its employees' working conditions in violation of section 1153(e) and (a)," and "the ALJ's conclusion that [Bertuccio's] one-day suspension of the employees who participated in the November 18 work stoppage was a violation of Labor Code section 1153(a)."

We have previously discussed an employer's duty to bargain a decision to change wages, hours, or "other terms and conditions of employment." (Lab. Code, § 1155.2, subd. (a); cf. *Labor Board* v. *Katz, supra,* 369 U.S. 736, 742-743 [8 L.Ed.2d 230, 235-236]; *Ruline Nursery Co.* v. *Agricultural Labor Relations Bd.* [1985] 169 Cal.App.3d 247, 264 [216 Cal.Rptr. 162].) As we have pointed out, the question whether a particular decision must be bargained will normally be answered by balancing management's interest in running its business against labor's interest in, and the amenability of the decision to, the collective bargaining process.

In this instance Bertuccio's compelling business reasons for getting his grown crop harvested notwithstanding transitory weather conditions are manifest; the impact of the decision upon conditions of employment can only be characterized as minimal; and the suggestion that Bertuccio should have been required either to have stopped harvesting altogether in order to have bargained this inconsequential matter when it arose or to have foreseen the issue and taken the initiative to bring it to the table in advance is absurd. This is especially true of a crop like lettuce which must be harvested within a matter of days or the field might as well be plowed under. We cannot countenance so gross an overextension of the decision-bargaining rules.

Nor can we regard the work stoppages as "protected activity" under Labor Code section 1152, or suspension of the 15 workers for 1 day as an illegal interference with the employees' rights under subdivision (a) of Labor Code section 1153.

Section 1152 permits farm workers "to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." We have concluded Bertuccio's decision to require workers to cut lettuce on rainy days was not a mandatory collective bargaining issue. The remaining question is whether the initial work stoppage could properly be linked to "mutual aid or protection," and thus deemed a protected activity under the labor statute.

■ "Concerted activity is protected if it meets four conditions: (1) there must be a work-related complaint or grievance; (2) a specific remedy or result must be sought through such activity; (3) the concerted activity must further some group interest; and (4) the activity should not be unlawful or otherwise improper (e.g., violent, in breach of contract or indefensibly disloyal). [Citing federal cases.]" (*Nash-DeCamp Co.* v. *Agricultural Labor Relations Bd.* (1983) 146 Cal.App.3d 92, 104 [193 Cal.Rptr. 910].)
■ But it should also be apparent that the right to interrupt the employer's economic activities by a spontaneous work stoppage cannot reasonably be predicated solely on workers' subjective perceptions of distinctions between comfortable and uncomfortable working conditions, or between anise and cardone, on the one hand, and lettuce, on the other. The record before us does not support the Board's conclusion that this was protected concerted activity. It follows that the brief suspension of the 15 workers cannot be regarded as an illegal interference with the workers' rights under the labor statute.

### DISPOSITIONS

In our proceeding H000334, for review of *Paul W. Bertuccio* (1982) 8 ALRB No. 101 as modified in *Paul W. Bertuccio* (1983) 9 ALRB No. 61: The request for judicial notice and the motion for limited prejudgment remand are denied. The decision and order of the Board are:

(1) Modified

(a) To annul the finding that Bertuccio was guilty of an unfair labor practice for having failed to bargain the effects of his decision to sell a garlic crop for seed in 1979, and to strike so much of the makewhole order as relates directly to the sale of the garlic crop; and

(b) To annul two findings that Bertuccio had not furnished timely or otherwise adequate responses to union requests for information, as set forth in the opinion;

(2) Remanded to the Board with directions

(a) To set aside the balance of its makewhole order;

(b) To reconsider the makewhole issues, in light of *William Dal Porto & Sons, Inc.* v. *Agricultural Labor Relations* Bd. (1987) 191 Cal.App.3d 1195 [237 Cal.Rptr. 206], as more fully set forth in the opinion, and in light of the modifications set forth above; and

(c) To determine whether makewhole should be ordered and, if so, to make such makewhole order as the Board finds to be appropriate in light of the proceedings on reconsideration and the views stated in this opinion; and

(3) Affirmed in all other respects.

In our proceeding H000351, for review of *Paul W. Bertuccio* (1984) 10 ALRB No. 16: The requests for judicial notice and the motion for limited prejudgment remand are denied. The decision and order of the Board are:

(1) Modified

(a) To annul the finding that Bertuccio improperly bargained directly with members of the bargaining unit concerning wages;

(b) To annul the finding that the union was not bound by the acceptance communicated by Bertuccio to the UFW, by telex, on July 25, 1982, and to enter a new finding that the acceptance was effective and that the UFW should have entered into a collective bargaining agreement at that time; and

(c) To annul the finding that Bertuccio had not furnished timely or otherwise adequate responses to three UFW requests for information, as set forth in the opinion;

(2) Remanded to the Board with directions

(a) To set aside its makewhole order;

(b) To provide Bertuccio the opportunity to offer evidence of union violence, relevant to the period from April 1981 to July 25, 1982, as set forth in the opinion;

(c) To reconsider the makewhole issues, in light of

(1) *William Dal Porto & Sons, Inc.* v. *Agricultural Labor Relations Bd., supra*, 191 Cal.App.3d 1195 [237 Cal.Rptr. 206], as more fully set forth in the opinion;

(2) The modifications set forth above;

(3) Our determination that makewhole cannot be awarded to an employee for any period when he or she is shown to have been on strike; and

(4) Any evidence of union violence offered and received in accordance with this opinion; and

(d) To determine whether makewhole should be ordered and, if so, to make such makewhole order as the Board finds to be appropriate, for the period beginning April 2, 1981, and ending no later than July 24, 1982, in light of the proceedings on reconsideration and the views stated in this opinion; and

(3) Affirmed in all other respects.

In our proceeding H000352, for review of *Paul W. Bertuccio* (1984) 10 ALRB No. 10: The request for judicial notice is denied. The decision and order of the Board are affirmed.

In our proceeding H000302, for review of *Bertuccio Farms* (1984) 10 ALRB No. 52: The request for judicial notice is denied. The decision and order of the Board are annulled.

Each party shall bear his or its own costs on review.

Agliano, P. J., and Capaccioli, J., concurred.

A petition for a rehearing was denied August 16, 1988, and respondent's petition for review by the Supreme Court was denied October 27, 1988. Mosk, J., and Arguelles, J., were of the opinion that the petition should be granted.